PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.                                                  No. 05-5238

RODNEY MAURICE SAUNDERS,
            *Defendant-Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William D. Quarles, Jr., District Judge.
(CR-04-406-WDQ)

Argued: May 25, 2007

Decided: September 11, 2007

Before MICHAEL and DUNCAN, Circuit Judges, and
Frank D. WHITNEY, United States District Judge for the
Western District of North Carolina, sitting by designation.

Affirmed by published opinion. Judge Michael wrote the opinion, in
which Judge Duncan and Judge Whitney joined.

## COUNSEL

**ARGUED:** Sarah S. Gannett, OFFICE OF THE FEDERAL PUBLIC
DEFENDER, Baltimore, Maryland, for Appellant. Paul M. Tiao,
Assistant United States Attorney, OFFICE OF THE UNITED
STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON
BRIEF:** James Wyda, Federal Public Defender, John H. Chun, Assis-

tant Federal Public Defender, Lauren E. Case, Staff Attorney, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

**OPINION**

MICHAEL, Circuit Judge:

Rodney Saunders appeals his conviction and sentence for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). His case arises out of a robbery at a Baltimore, Maryland, liquor store. We affirm, holding that (1) a key witness's identification of Saunders as one of the robbers was reliable, even though the police showed the witness a photo array that was impermissibly suggestive; (2) there was no error when the jury was not given a special verdict form that would have allowed it to indicate whether it reached unanimous agreement on the specific gun or guns possessed by Saunders; (3) the evidence was sufficient to support Saunders's conviction on the § 922(g)(1) gun charge; and (4) the evidence was sufficient to support the four-level sentencing enhancement, *see* U.S.S.G. § 2K2.1(b)(5) (2004), based on Saunders's use of a firearm in connection with another felony offense.

I.

Saunders, Tavon Walker, and a third (unidentified) man entered the Club Paradise liquor store in Baltimore at 1:30 a.m. on December 8, 2003. Saunders and the unidentified man proceeded at gunpoint to rob the three customers in the store, after patting down and neutralizing the one security guard. Walker stayed at the entrance of the store to prevent anyone from entering or exiting.

The store's cashier, Tony Burton, witnessed the robbery from behind the bullet-proof window that separates the cash register from the area of the store accessible to customers. As the robbery was in progress, Burton picked up the telephone receiver, which was below the counter, and dialed 911. To avoid detection, he bent down and

quickly stated that there was a "[r]obbery in progress at 1300 North Carey Street." J.A. 141. The robbers fled the store as Burton hung up the phone. Moments later, the 911 dispatcher called back, and Burton reported some of the details. He told the dispatcher that the liquor store had been robbed by three African American males carrying guns; that one of the robbers "had a long black jacket on, a hipster, and one had a gray . . . sweatshirt" with a "black scarf tied around his face," J.A. 615; and that the three robbers drove away in a blue Dodge Caravan minivan with "brown oak wood on the side," J.A. 615.

The dispatcher immediately reported the robbery and the description of the getaway vehicle over the police radio. A blue Dodge minivan with oak paneling was quickly spotted by two officers who were patrolling the neighborhood near Club Paradise in separate cruisers. Officer Osiris Lofton pulled behind the van and followed it to the intersection of Harlem Avenue and Carey Street, only six blocks away from Club Paradise. Officer James Gomez saw the van as he approached the intersection from the opposite direction. The two officers activated their blue lights and pulled the van over. Officer Lofton parked his cruiser behind the van, and Officer Gomez parked in front. Saunders immediately opened the van's sliding door and ran. As Saunders exited the van, Officer Gomez saw "a gun [fall] between the van and the curb." J.A. 287.

Officer Gomez pursued Saunders through a vacant lot, where Saunders reached into his waistband and tossed a dark, hard object to the ground. Saunders continued running north on Carey Street, across Lanvale Avenue, and on to Calhoun Street, where he discarded his leather jacket. Moments later, Officer Kenneth Ivery, who had been following Saunders in his cruiser, maneuvered his vehicle to block Saunders's path. This tactic slowed Saunders sufficiently to allow Officers Gomez and Ivery to catch up to him and tackle him to the ground.

Meanwhile, Officer Lofton pursued Walker, who had jumped out of the van after Saunders. Officer Lofton chased Walker for several blocks and captured him as he attempted to hide in a ditch near an alley. Walker was wearing a gray hooded jacket and a black bandana. Other participants in the robbery, including the third robber in the

store, escaped in the minivan as the officers pursued Saunders and Walker.

After Saunders and Walker were captured, the police canvassed their flight routes and the area where the minivan was stopped. Three handguns were recovered. A black Bryco nine millimeter and a silver Smith & Wesson nine millimeter were found by the curb where Saunders got out of the minivan. The third handgun, a dark colored .380 caliber Tanfoglio, was recovered in the vacant lot where Officer Gomez saw Saunders throw an object to the ground. The Tanfoglio handgun was loaded with .380 Winchester ammunition, the same type that Saunders had bought three months earlier at a Sports Authority store in Baltimore. Officer Gomez also collected the medium length ("hipster") leather jacket that Saunders had discarded on Calhoun Street.

In the meantime, one or more officers went to the Club Paradise liquor store and asked Burton (the cashier) to accompany them to the area of the arrests for a "show up" identification of the suspects. One officer drove Burton to the area, but by the time they arrived, Saunders and Walker had already been transported to the police station. Burton was then taken to the station where, about two hours after the arrests, he participated in photo array identification procedures.

Officer Michael DeJesus gave Burton a photo array containing six color photos, arranged in two rows of three. Saunders's photo was located in the bottom right-hand corner. The five decoy or filler photos were taken from a computer program called the "District Court Tracking System." (This program selects photos from a large database after the police enter the suspect's physical characteristics, such as skin color, height, weight, age, hair style, etc.) The computer generated five photos of casually dressed African American males in their twenties, with closely cut hair, a thin mustache, and a medium build. Significantly, the five filler photos were taken against light backgrounds with overhead lighting. Saunders's photo, on the other hand, was set against a dark background and was taken without overhead lighting. Saunders's face therefore appears significantly darker than the faces of the decoy suspects.

Officer DeJesus did not inform Burton, as required by Baltimore City police procedures, that the photo array might not contain a photo

of the suspect. (DeJesus conceded at trial that he never received training on administering photo arrays, nor had he reviewed the Baltimore City Police general order on photo array procedures.) In any event, DeJesus asked Burton whether he recognized from the robbery any of the persons in the array. Burton studied the six photos for approximately ten seconds before selecting Saunders's photo, stating that he was "[t]he guy who came in[to the store] second." J.A. 80. DeJesus then provided Burton another six-photo array that included a photo of Walker. Burton did not identify any of the persons in that array.

Saunders was indicted on one count for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He was charged with possessing all three of the firearms recovered in his flight path, beginning with the two at the curb where he exited the minivan. Saunders moved to suppress the pre-trial photo identification and any in-court identification by Burton, claiming that his photo in the array was so suggestive that it violated his right to due process. After the district court denied the motion, Saunders went to trial and was convicted. At sentencing the district court imposed, over Saunders's objection, a four-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(5) (2004) for the use of a firearm in connection with another felony offense. With an adjusted guideline offense level of 28 and a criminal history category of IV, Saunders's nominal guideline range was 110-137 months' imprisonment. Because the maximum term authorized by statute for a conviction under 18 U.S.C. § 922(g) is 120 months, Saunders's actual guideline range was restricted to 110-120 months. *See* 18 U.S.C. § 924(a)(2); U.S.S.G. § 5G1.1, comment. He was sentenced to a term of 120 months.

Saunders appeals his conviction and sentence. He argues (1) that the district court erred in denying his motion to suppress the cashier's out-of-court and in-court identifications of him; (2) that his constitutional right to a unanimous verdict was violated because the jury was not provided with a special verdict form requiring unanimous agreement on the particular gun or guns possessed; (3) that there was insufficient evidence to support his conviction for possession of a firearm; and (4) that the four-level enhancement under § 2K2.1(b)(5) was improper because the evidence was insufficient to prove that he participated in the Club Paradise robbery. We consider Saunders's arguments in turn.

## II.

Saunders's principal argument is that the district court erred in denying his motion to suppress the out-of-court and in-court identifications of him by Burton, the cashier. Saunders argues that Burton's out-of-court photo identification violated his right to due process because the photo array was impermissibly suggestive. Burton's in-court identification should also have been excluded, he argues, because it was tainted by the suggestive photo array. The district court disagreed, concluding that the photo array was not suggestive and that Burton's identification did not violate the Due Process Clause. The district court's findings as to the factual particulars of Burton's identification, which we would review for clear error, are not contested. We review *de novo* the court's legal conclusion as to whether the identification violated the Due Process Clause. *See United States v. Burgos*, 55 F.3d 933, 941 (4th Cir. 1995).

Due process principles prohibit the admission at trial of an out-of-court identification obtained through procedures "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). The Due Process Clause is not implicated, however, if the "identification was sufficiently reliable to preclude the substantial likelihood of misidentification." *United States v. Johnson*, 114 F.3d 435, 442 (4th Cir. 1997); *see also Manson v. Brathwaite*, 432 U.S. 98, 106 (1977) (stating that the central question is "whether under the totality of the circumstances the identification was reliable even though the [identification] procedure was suggestive") (internal quotations omitted). The consideration of whether the identification testimony is admissible proceeds in two steps. *United States v. Wilkerson*, 84 F.3d 692, 695 (4th Cir. 1996) (citing *Brathwaite*, 432 U.S. at 110). First, the defendant must show that the photo identification procedure was impermissibly suggestive.[1] Second, if the defendant meets this burden, a court considers whether the identification was nevertheless reliable in the context of all of the circumstances. *Id*. A witness's out-

---

[1] When the suggestiveness in the procedure does not reach the impermissible level, the "potential for error" (or potential for misidentification) is left for testing "by a course of cross-examination at trial." *Simmons*, 390 U.S. at 384.

of-court photo identification that is unreliable and therefore inadmissible on due process grounds also renders as inadmissible his subsequent in-court identification. *Simmons*, 390 U.S. at 383-84; *United States v. Smith*, 459 F.3d 1276, 1293-94 (11th Cir. 2006); *Amador v. Quarterman*, 458 F.3d 397, 413 (5th Cir. 2006). In this circumstance, as the Supreme Court has said, the witness "is apt to retain in his memory the image of the photograph rather than the person actually seen, reducing the trustworthiness of subsequent . . . courtroom identification." *Simmons*, 390 U.S. at 383-84.

A.

We conclude — based on the particular facts and circumstances presented here — that the six-photo array shown to the witness Burton was impermissibly suggestive for two reasons. First, Saunders's photo looked strikingly different from the five filler photos, considered as a group. Second, the effect of this jarring disparity was exacerbated by the failure of the police to follow their own internal procedures, which require that certain precautions be taken before a photo array is shown to a witness. We will discuss each of these concerns.

Saunders's photo stood out sharply from the others in the array. The dark background and lack of overhead lighting in Saunders's photo distinguished it from the remaining five photos, all of which had light backgrounds and overhead lighting. *See United States v. Wiseman*, 172 F.3d 1196, 1209 (10th Cir. 1999) ("[D]ifferences such as background color can make a picture stand out, and can act to repeatedly draw a witness's eye to that picture.") (citation omitted); *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003) (a photo that stands out from the others "implicitly suggests to the witness that 'this is the man'"). We recognize that there may be differences in background and lighting among the various photos in an array, and such differences do not automatically create impermissible suggestiveness. The risk of suggestiveness comes when one photo stands out, as Saunders's did here.

The differences that caused Saunders's photo to stand out were quite marked, yielding potentially problematic consequences. The dark background and lack of lighting in Saunders's photo gave him

a menacing countenance that was lacking in the men in the other five photos. In addition, the fact that Saunders's photo differed significantly from the others as a group could have suggested to a viewer that Saunders's photo was taken at a different time and place than the rest. *Cf. Johnston v. Makowski*, 823 F.2d 387, 391 (10th Cir. 1987) (concluding that photo array was impermissibly suggestive because defendant's "picture obviously was newly taken, whereas the other pictures were visibly older"). Specifically, there is a risk that the viewer may conclude "that the similar pictures were taken together to form a pool or control group, and that the one picture that stands out is the suspect." *United States v. Sanchez*, 24 F.3d 1259, 1262-63 (10th Cir. 1994).[2]

The suggestive nature of the photo array was exacerbated here by the failure of the police to take precautions that would have reduced the risk of a tainted identification. On the way to the station house the police informed Burton that they had arrested one or more suspects in the robbery. Imparting this information to the witness can lead him to assume that a photo of the arrested person will be in the array. The witness, moreover, can feel pressure to make an identification, even if he is not fully confident, for fear of jeopardizing the case against the arrested suspect. *Cf. Simmons*, 390 U.S. at 383 (stating that the "chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime"); *Grubbs v. Hannigan*, 982 F.2d 1483, 1490 (10th Cir. 1993) (stating that the distinct characteristics of the suspect's photo were highlighted by the fact that the police had informed the witness that they had a suspect in custody).

---

[2]We in no way imply that the array was intentionally assembled in a suggestive manner. Nor do we question the government's explanation as to how it was created. We merely note that the photo technology available today provides the capability to assemble a set of filler photos that would minimize disparities as dramatic as these. Moreover, Saunders was in custody, so better care could have been taken in arranging the background and lighting conditions for his photo. *Cf. Neil v. Biggers*, 409 U.S. 188, 198 (1972) (stating that "unnecessarily suggestive [identification procedures] are condemned for the further reason that the increased chance of misidentification is gratuitous").

To mitigate just this risk, the Baltimore City Police Department's general order on photo array procedures has a provision aimed at avoiding improper influence on a witness who might know or believe that a suspect is in custody. The order requires the police to instruct the witness that the array may not contain a photo of the person under investigation. This instruction was not given to the witness Burton in this case.

We note parenthetically that there may be unavoidable circumstances when the police will not have the opportunity to eliminate or minimize suggestive differences between the group of filler photos in an array and the suspect's. For example, the suspect may not be in custody (unlike Saunders here), and the police may have to arrange an array using a photo of the suspect that was taken under conditions beyond their control. Even then, however, taking practical precautions, such as giving the instruction required by the general order governing Baltimore police, can help to mitigate the effect of suggestive disparities that are unavoidable. *See Wiseman*, 172 F.3d at 1209 (noting that the manner of presentation and number of photos can "dilute the 'suggestive irregularities' of the array"). Of course, even when suggestiveness is not sufficiently mitigated, an otherwise reliable identification is still admissible.

Our decision on the suggestiveness issue is based on the facts. Given both the starkness of the disparity between Saunders's photo and the group of filler photos, and the failure of the police to mitigate the effects of this disparity, we must conclude that the photo array was impermissibly suggestive. Our analysis of the admissibility of Burton's identification of Saunders thus moves to the next step.

B.

An out-of-court identification from an impermissibly suggestive photo array may nevertheless be admitted at trial if the identification can be deemed reliable. The following five factors are considered in assessing the reliability of such an out-of-court identification: (1) the witness's opportunity to view the suspect at the time of the crime; (2) the witness's degree of attention at the time; (3) the accuracy of the witness's initial description of the suspect; (4) the witness's level of certainty in making the identification; and (5) the length of time

between the crime and the identification. *Johnson*, 114 F.3d at 441 (citing *Neil v. Biggers*, 409 U.S. at 199-200). In addition, courts may "consider other evidence of the defendant's guilt when assessing the reliability of the . . . identification." *Wilkerson*, 84 F.3d at 695.

The first two factors — opportunity to see the suspect and degree of attention — indicate that the identification here was reliable. Burton had a good opportunity to view Saunders during the robbery. Burton testified that Saunders "came in the door, he opened the door, he came in, and he walked directly toward the [cashier's] window, which is when me and him made eye contact." J.A. 135. Saunders stopped just a few feet from Burton, and the two had the eye contact for "about three to four seconds, maybe a little longer." J.A. 136-37. Burton explained that he paid attention to Saunders as he entered the store because he has a habit of "always look[ing] at the next person that's coming in just to see who they are and if something might occur." J.A. 137. After his initial observation of Saunders, Burton turned away for a moment to help a customer. As he turned back, he saw Saunders patting down the store's security guard. At this point, when Burton had a greater incentive to observe Saunders, he had a clear view of the side of Saunders's face. *See Mysholowsky v. New York*, 535 F.2d 194, 197 (2d Cir. 1976) (stating that a victim of a crime is more likely than a casual bystander to pay close attention to the criminal's appearance); *Levasseur v. Pepe*, 70 F.3d 187, 195 (1st Cir. 1995) (stating that a victim's "degree of attention during a traumatic experience is presumed to have been acute"). In short, Burton had a sufficient opportunity to observe Saunders and to form a reliable recollection of what he looked like.

The third factor, the accuracy of the witness's initial description, weighs in favor of a reliable identification. Burton's description of Saunders was generally accurate. Burton described Saunders to the police as a black male of "medium build, medium height," J.A. 78, which he later defined as 5'7" and 160-170 pounds. He said that Saunders wore a black "hipster" leather jacket and jeans and that he had closely trimmed hair and a "slight mustache." J.A. 77-78. Burton's description of Saunders's weight, haircut, mustache, and leather jacket was accurate. Burton's initial statement that Saunders was of medium height was also accurate, even though Burton later underestimated Saunders's height by about four inches. The only other minor

inaccuracy is that Saunders was not wearing jeans as Burton reported, but gray sweatpants. All in all, Burton's description of Saunders, which was flawless in several important particulars, was accurate.

The last two factors — level of certainty in the identification and time between the crime and the identification — support a conclusion that the identification was reliable. Burton did not hesitate when selecting Saunders's photo from the array. Burton testified, "I looked, I gave a good look at the picture to make sure, and pointed to him." J.A. 166. Burton's inability to identify the photo of Walker, another robber, from the second array also indicates that Burton would not have identified Saunders if he had not been confident that he recognized him from the robbery. Furthermore, Burton made the photo identification of Saunders only two hours after the robbery occurred, when his recollection of the crime was still fresh. *See Albert v. Montgomery*, 732 F.2d 865, 872 (11th Cir. 1984) (stating that the two-day period between the attack and the identification supported finding of reliability); *United States v. Evans*, 484 F.2d 1178, 1185 (2d Cir. 1973) (stating that photo identification several hours after the robbery occurred indicated that the identification was reliable).

The reliability of the out-of-court identification is further supported by other evidence that connects Saunders to the Club Paradise robbery. *See Wilkerson*, 84 F.3d at 695 (stating that the court may consider other evidence of the defendant's guilt when determining the reliability of an identification). First, Saunders was arrested as he fled from a van, which matched the description of the getaway vehicle, six blocks from Club Paradise shortly after the robbery occurred. Second, Officer Gomez observed Saunders toss a gun to the ground as he tried to escape; two other guns were recovered from the spot where Saunders got out of the van. Finally, Saunders's leather jacket and his physical characteristics generally matched Burton's description of one of the three robbers.

C.

In sum, although the photo array was impermissibly suggestive, Burton's identification of Saunders was reliable under the circumstances. Burton had sufficient opportunity to view Saunders during the robbery; his initial description of Saunders was generally accu-

rate; the photo identification took place shortly after the robbery when Burton's recollection was fresh; and there is other evidence connecting Saunders to the robbery at Club Paradise. Accordingly, the admission of evidence of the out-of-court identification did not violate Saunders's right to due process; nor did it taint the in-court identification.

III.

Saunders claims that his constitutional right to a unanimous jury was violated because the jury was not given a special verdict form that would have allowed it to indicate whether it had reached unanimous agreement on his possession of one or more of the specific guns listed in the indictment. He contends that the use of a general verdict form and the return of a "general verdict make[ ] it impossible to tell whether the jurors were unanimous with regard to [a specific gun] upon which their verdict was based." Appellant's Br. at 29.

The district court agreed with Saunders that the jury had to agree unanimously on the particular gun possessed in order to return a guilty verdict. For this reason, the district court indicated it would issue a special verdict form to the jury. Due to an administrative error, however, the jury never received the special verdict form.

The government does not contend that juror unanimity with respect to the specific gun possessed is not required for a conviction under 18 U.S.C. § 922(g)(1). Rather, it contends that the use of a general verdict form, coupled with the court's instruction that the jury had to be unanimous as to the gun or guns possessed, was adequate. We assume, without deciding, that a conviction under § 922(g)(1) requires the jury to agree unanimously on the specific gun possessed by the defendant. *Cf. United States v. Theodoropoulos*, 866 F.2d 587, 597 (3d Cir. 1989) (stating that district court "properly instructed the jury that they must unanimously agree on which weapon" the defendant had used to convict him under § 924(c)).[3] Any right Saunders

---

[3]Several circuits have concluded that a conviction under § 922(g) does not require juror unanimity on the specific gun possessed. *See United States v. DeJohn*, 368 F.3d 533, 542 (6th Cir. 2004); *United States v. Verrecchia*, 196 F.3d 294, 301 (1st Cir. 1999); *cf. United States v. Correa-Ventura*, 6 F.3d 1070, 1087 (5th Cir. 1993) (stating that jury does not need to unanimously agree on the specific firearm to convict under § 924(c)).

had to a unanimous jury with respect to the specific gun or guns involved was not violated because the district court properly instructed the jury on the unanimity requirement. The court stated,

> You must also agree, all of you, that [Saunders] possessed the same firearm. You cannot convict, for example, if six of you believe he possessed one of the guns, and six of you believe he possessed another of the guns. You have to unanimously agree that he possessed the firearms charged or, as I said, one of the firearms charged before he can be convicted.

J.A. 558. This instruction was clear in requiring a unanimous finding with respect to the possession of at least one of the firearms charged. We must assume that the jury followed this instruction, *see United States v. Pierce*, 479 F.3d 546, 552 (8th Cir. 2007), and that it unanimously agreed that Saunders possessed at least one specific gun listed in the indictment. Thus, the use of a general verdict form did not violate Saunders's right to a unanimous jury. *See United States v. Russell*, 134 F.3d 171, 177 n.2 (3d Cir. 1998) (noting that the district court did not need to provide a special verdict form in addition to a specific unanimity instruction).

## IV.

Saunders claims that the evidence was insufficient to convict him under 18 U.S.C. § 922(g)(1) as a felon in possession of a firearm. Saunders stipulated at trial that he had a prior felony conviction and that the recovered firearms had traveled in interstate commerce. Accordingly, he only challenges the jury's finding that he possessed one or more of the firearms identified in the indictment. We must uphold the jury's verdict "if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80 (1942).

There was substantial evidence to support a jury's finding that Saunders was in possession of at least one firearm. First, Burton testified that Saunders was one of the men who participated in the robbery at the Club Paradise liquor store and that Saunders was carrying a "shiny" gun. J.A. 138. Burton's testimony was corroborated by the

fact that Saunders was caught minutes later after he jumped out of a van matching the description of the getaway vehicle that Burton gave to the 911 dispatcher. Second, Officer Gomez saw a gun fall to the ground as Saunders jumped out of the van. The police later recovered two handguns (a black Bryco nine millimeter and a silver Smith & Wesson nine millimeter) from the spot where the van had been stopped by police. The Smith & Wesson matches Burton's description of the gun that Saunders carried during the robbery. Third, Officer Gomez watched Saunders toss a dark object to the ground as he ran through a vacant lot. After Saunders was arrested, Gomez returned to the lot and recovered a black Tanfoglio .380 caliber semi-automatic handgun. Saunders had purchased Winchester .380 ammunition, the same type found in the Tanfoglio, several months prior to the robbery. This evidence allowed the jury to find that Saunders possessed one of the three guns listed in the indictment.

V.

Saunders's final argument relates to his sentence. He contends that the district court erred in imposing a four-level enhancement under U.S.S.G. § 2K2.1(b)(5) (2004) because Saunders used a firearm in connection with another felony offense, a robbery. Specifically, Saunders contends that "the evidence was insufficient to support a finding that [he] was involved in the robbery" at the Club Paradise liquor store. Appellant's Br. at 37. This argument fails completely. As our discussion in parts II and IV make clear, the evidence was sufficient to establish that Saunders participated in the robbery. The § 2K2.1(b)(5) enhancement is therefore amply supported by the evidence.

\* \* \*

Rodney Saunders's conviction and sentence are

*AFFIRMED.*