**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-4551

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

TYREE BELK,

Defendant – Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Max O. Cogburn, Jr., District Judge.  (3:17−cr−00347−MOC−DCK−1)

Submitted:  June 28, 2022                          Decided:  December 22, 2022

Before DIAZ and QUATTLEBAUM, Circuit Judges, and FLOYD, Senior Circuit Judge.

Affirmed in part, vacated in part, and remanded for resentencing by unpublished per curiam opinion.

**ON BRIEF:** James W. Kilbourne, Jr., ALLEN, STAHL & KILBOURNE, PLLC, Asheville, North Carolina, for Appellant.  William T. Stetzer, Acting United States Attorney, Charlotte, North Carolina, Amy E. Ray, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In July 2019, a jury found Tyree Belk guilty on several counts, including robbery and possession with intent to distribute a controlled substance analogue.[1]  Belk appeals, alleging (1) the district court violated his due process rights by not giving him full access to discovery while he was pro se, (2) the district court erred by denying his motion for a *Franks* hearing,[2] (3) the district court improperly admitted in-court and out-of-court identification testimony, and (4) there was insufficient evidence for the jury to convict him of possession with intent to distribute a controlled substance analogue (Count Four).  We agree with Belk as to his last argument, so we vacate his conviction on Count Four and remand with instructions that the district court enter a judgment of acquittal on that count and resentence Belk.  We otherwise affirm.

---

[1] A "controlled substance analogue" is a substance "the chemical structure of which is substantially similar to that of a controlled substance in schedule I or II, and which has an actual, claimed, or intended stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than that of a controlled substance in schedule I or II." *United States v. McFadden*, 823 F.3d 217, 220 (4th Cir. 2016) (citing 21 U.S.C. § 802(32)(A)) (cleaned up).

[2] The Fourth Amendment requires a court to hold a hearing on the veracity of the contents of a search warrant affidavit "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," to determine whether "the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978).

I.

A.

In April 2017, a deli employee observed a man and a woman park a white Pontiac Grand Prix outside a nearby "Skillz Biz" gaming store in Charlotte, North Carolina, the man take out a gun, and both pull ski masks over their faces and enter the store. The employee eyewitness told a coworker to call the police.

The two suspects robbed a Skillz Biz employee at gunpoint, driving away with a little over $3,000. The police arrived afterward and interviewed the eyewitness, who described the suspects and their car's make, model, and license plate number. A detective, Jamie C. Smith, ran the tag and learned it belonged to defendant Tyree Belk.

Smith showed the eyewitness a photo lineup of six men that included Belk. The eyewitness identified Belk, and when an officer asked him "how sure he was on a scale of 0-100 percent, he stated that he was 75% sure." J.A. 109. Smith then sought a warrant from a state magistrate for Belk's arrest and submitted an affidavit that stated the eyewitness "positively identified Belk." J.A. 126. Police also issued a "be on the lookout" notice for the car.

An officer spotted the car and pulled it over. Belk was driving and a woman, Gina Cathcart, was in the front seat. The officer arrested Belk when he learned the warrant was pending. During the resulting search of Belk, the officer found a hotel key card and about $1,270.

Officers took Belk to jail and collected a DNA sample. Belk refused to speak to the police. Cathcart, however, confessed to the robbery and that the officers would discover

3

drugs on her person and in the car.  Officers later discovered around four grams of N-Ethylpentylone ("bath salts") packaged in nine "plastic corners" in the car's glove compartment.  S.J.A. 11.

Officers obtained a warrant to search the room associated with the hotel key card.  In it, officers found a handgun with Belk's DNA.

B.

A grand jury issued a nine-count indictment against Belk.  Although he was represented by counsel, Belk filed multiple pro se motions requesting new representation.  The court held a hearing, during which Belk's counsel withdrew.  The court then appointed Brent Walker as Belk's counsel.

One week before Belk's trial was scheduled to begin, the court held another hearing to inquire about counsel.[3]  Belk moved to represent himself and Walker moved to withdraw.  The district court granted Belk's motion and appointed Walker as standby counsel.

Two months later, Belk moved for a *Franks* hearing on the validity of his arrest warrant, arguing Detective Smith omitted and falsified relevant facts such as not including that the eyewitness was only "75% sure" of his identification.  The court denied his motion.

Two months after that, Belk moved to suppress, arguing that the officer who arrested him did so without probable cause.  The district court held a hearing and denied Belk's

---

[3] During the hearing, the prosecutor and Walker noted that Belk's trial may not begin the next week because of a long trial taking place before his.  The trial was ultimately postponed several months.

4

motion. In his motion and during the suppression hearing, Belk claimed Walker's attorney-client visits were not regular enough for Belk to review "all of the voluminous discovery" in the case. J.A. 149.

At the end of the hearing, Belk confirmed that he had received copies of the grand jury transcripts, though they had come late. And he asked that Walker take over his case, explaining that he felt he could not represent himself to "the best of [his] degree" because of "the limited amount of access [and] time" he had to review the grand jury transcripts. J.A. 297. The court granted Belk's request and reappointed Walker as counsel. Walker stated he had reviewed all the discovery material, and that he would stay at the courthouse to review it with Belk.

Belk's trial began the next week. The eyewitness testified about identifying Belk in the photo lineup, again noting he was 75 percent sure. The prosecutor played a video of a suspect going into the Skillz Biz and asked the eyewitness if he recognized the individual. The eyewitness confirmed it was the person he saw enter the store. While a photo of the suspect was still up, the prosecution asked the eyewitness to identify the suspect in the courtroom. The eyewitness pointed at Belk, describing him as "African-American. He looks to be about 6'1", 6'2"." J.A. 557. The court warned the prosecutor, "In the future don't put pictures up while [the eyewitness is] identifying the person." *Id.* But the court didn't strike the identification.

Cathcart testified that she and Belk robbed the Skillz Biz. She also claimed that the drugs found on her were from Belk, and that she earlier saw Belk give what she thought was "crack cocaine" to his brother. J.A. 794.

5

A chemist testified that the substance found in the white Pontiac's glovebox was N-Ethylpentylone which is "substantially similar" to other controlled substances. J.A. 623.

Others also testified, including police who arrived on scene after the robbery.

After the government rested, Belk moved for a judgment of acquittal on all counts. The court granted the motion on one count: possession of a firearm in furtherance of a drug trafficking crime. Belk then presented his case and renewed his motion for judgment of acquittal on the remaining counts. The district court denied the motion.

The jury found Belk guilty of (Count One) conspiracy to commit Hobbs Act robbery, (Count Two) Hobbs Act robbery, (Count Three) brandishing a firearm during and in relation to the robbery, (Count Four) possession with intent to distribute a controlled-substance analogue, and (Count Six) possessing a firearm as a felon. The jury found Belk not guilty of the other charges.

The district court sentenced Belk to 135 months in prison. Belk timely appealed.

## II.

### A.

We begin with (and reject) Belk's claim that he was denied due process because he didn't have full access to discovery.

Belk didn't raise a due process argument during trial, so we review for plain error. *See United States v. Banks*, 29 F.4th 168, 174 (4th Cir. 2022). "Before we will consider reversing under plain-error review, (1) there must be an error; (2) the error must be plain, meaning obvious or clear under current law; and (3) the error must affect substantial

6

rights." *United States v. Knight*, 606 F.3d 171, 177 (4th Cir. 2010) (cleaned up). Federal Rule of Criminal Procedure 52(b) "leaves the decision to correct the forfeited error within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732 (1993) (cleaned up).

As a pro se defendant, Belk was entitled to "the means of presenting his best defense," including having the "time and facilities for investigation and for the production of evidence." *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279 (1942). And the record reflects that Belk made several requests to obtain and review the extensive discovery materials. But the record also shows the court promptly responded to Belk's requests. In the hearing where Belk asked to represent himself, the court noted that standby counsel, who had reviewed the materials, could "set up discovery and kind of run through it with" Belk. J.A. 63. And in a later hearing, the court offered to postpone certain witness testimony to allow Belk more time to review relevant materials, and directed standby counsel to go over discovery with Belk that afternoon. J.A. 290–91.

Even assuming Belk didn't have adequate access to discovery, we see no harm to his "substantial rights." At his request, Belk was represented by counsel, Walker, at trial. Walker had been on the case for months, first as Belk's lawyer and then as standby counsel, and had reviewed the discovery materials. And Walker didn't request a continuance to review discovery, further suggesting Belk suffered no prejudice. *See United States v. Uzenski*, 434 F.3d 690, 709 (4th Cir. 2006) (defendant "had not suffered prejudice by the denial of discovery" where counsel didn't request a continuance). Finally, there's no

7

evidence that Belk's attorney was unprepared or that any error "seriously affect[ed] the fairness, integrity or public reputation of [Belk's] judicial proceedings." *Olano*, 507 U.S. at 732. We thus find no due process violation.

B.

Belk also challenges the district court's denial of his *Franks* hearing request over the validity of the affidavit for his warrant. He claims Detective Smith both omitted relevant information and falsified information. Finding no error, we affirm the district court.

In considering whether the district court should have ordered a *Franks* hearing, we review legal determinations de novo and any factual findings for clear error. *United States v. Seigler*, 990 F.3d 331, 344 (4th Cir. 2021).

To show he's entitled to a *Franks* hearing, Belk "must make a substantial preliminary showing that false statements were either knowingly or recklessly included in an affidavit supporting [an arrest] warrant *and* that, without those false statements, the affidavit cannot support a probable cause finding." *Id.* at 344.

A defendant relying on an omission "must provide a substantial preliminary showing that (1) law enforcement made an omission; (2) law enforcement made the omission knowingly and intentionally, or with reckless disregard for the truth; and (3) the inclusion of the omitted evidence in the affidavit would have defeated its probable cause." *United States v. Haas*, 986 F.3d 467, 474 (4th Cir. 2021) (cleaned up). One way to show reckless disregard "is by proffering evidence that a police officer failed to inform the judicial officer of facts he knew would negate probable cause." *United States v. Lull*, 824

8

F.3d 109, 117 (4th Cir. 2016) (cleaned up). And "the significance—or insignificance—of a particular omission to the determination of probable cause may inform our conclusion regarding the agent's intent." *Id.*

Belk notes that Detective Smith (1) didn't include in his affidavit that the eyewitness was only 75 percent certain in his identification and (2) incorrectly claimed in the affidavit that the witness saw Belk get into his car and leave the area. But there's no evidence that Smith acted intentionally or with reckless disregard for the truth. And this isn't a case in which the alleged errors were "clearly critical to the finding of probable cause." *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990) (cleaned up).

That's because the affidavit included other information that independently supported probable cause. It explained that the eyewitness saw the suspects "hanging around" a white Pontiac Grand Prix and that this vehicle "is registered to the suspect." J.A. 111. It also noted the witness's physical descriptions of the suspects, and that the eyewitness saw them "walk in front of his business and down to where the victim business was located" and "pull masks over their faces and enter the business." *Id.* This information is sufficient for a finding of probable cause. *See United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2012) ("Probable cause is a flexible standard that simply requires a reasonable ground for belief of guilt and more than bare suspicion." (cleaned up)). Thus, the district court didn't err in denying Belk's motion for a *Franks* hearing.

## C.

Next, we find no error in the district court's decision to admit the out-of-court and in-court identifications. The photo lineup from which the witness identified Belk wasn't

9

impermissibly suggestive. And even if it were, the witness's in-court identification of Belk was reliable.

Because Belk didn't object to the identification at trial, we again review for plain error. *Banks*, 29 F.4th at 174.

To prove that an out-of-court identification is inadmissible, the defendant must first establish "that the photographic lineup procedure was impermissibly suggestive." *United States v. Wilkerson*, 84 F.3d 692, 695 (4th Cir. 1996). A procedure is impermissibly suggestive "if a positive identification is likely to result from factors other than the witness's own recollection of the crime." *Satcher v. Pruett*, 126 F.3d 561, 566 (4th Cir. 1997). If the defendant meets this burden, we consider whether the identification was "nevertheless reliable in the context of all the circumstances." *United States v. Saunders*, 501 F.3d 384, 389–90 (4th Cir. 2007).

Belk's challenge fails at the first step. We see no characteristics of an impermissibly suggestive lineup. The photo array included six photos of African-American men, all with relatively short hair. Although Belk's hair was longer than four of the other five, the difference wasn't significant. And while there was variation in skin tone, it wasn't substantial, nor was Belk on either extreme. Some photos had brighter lighting and others had darker lighting than Belk's photo, but there was nothing that made Belk's photo stand out. *See id.* at 390 ("The risk of suggestiveness comes when one photo stands out."). Nor was there any sign that Belk's photo was taken at a different time or place than all others in the lineup, and all were cropped as headshots. *See id.* ("The fact that [the defendant's] photo differed significantly from the others as a group could have suggested to a viewer

10

that [his] photo was taken at a different time and place than the rest."). And each person, including Belk, was only in the lineup once. *See Simmons v. United States*, 390 U.S. 377, 383 (1968) (explaining that the danger of an incorrect identification increases "if the police display to the witness . . . the pictures of several persons among which the photograph of a single [] individual recurs"). Given the above, we see no evidence that the out-of-court photo lineup was impermissibly suggestive.

Although we need not examine the second step, the in-court identification was also reliable. On this issue, we consider several factors, including

> (1) the witness's opportunity to view the suspect at the time of the crime; (2) the witness's degree of attention at the time; (3) the accuracy of the witness's initial description of the suspect; (4) the witness's level of certainty in making the identification; and (5) the length of time between the crime and the identification.

*Saunders*, 501 F.3d at 391.

The witness saw Belk in daylight, before Belk put on a ski mask, and identified him in the photo lineup later that day. And the witness's description of Belk was accurate. Although Belk points to minor deviations between the description and reality—such as a slight difference in height and hairstyle—we don't demand perfection. *See, e.g.*, *United States v. Lewis*, 719 F. App'x 210, 217 (4th Cir. 2018) (unpublished) (finding that the witness's identification was "relatively consistent" with how the defendant appeared the night of the crime when the description "matche[d] how [the defendant] appeared on the video of the show-up procedure").

Although the witness was only "75% sure" of his photo identification, this alone doesn't shatter reliability, given that the witness conveyed a high level of certainty. Belk

11

also argues the prosecution "manipulated" the witness's in-court identification when he showed an exhibit photo of Belk "as he appeared in the courtroom" and left the photo up during the in-court identification. Appellant's Br. at 33–34. Although these factors may cut against reliability, they're not dispositive. Additionally, Belk's counsel didn't object when these issues arose.

Lastly, Belk correctly notes that suggestive out-of-court procedures can taint in-court identification. *See Neil v. Biggers*, 409 U.S. 188, 198 (1972). But given our conclusion that the photo lineup was innocuous, we need not consider if it polluted any later testimony.

We affirm the district court's evidentiary rulings.

### D.

Lastly, Belk asks us to overturn his conviction for possession with intent to distribute a controlled substance analogue (Count Four). His argument is threefold. First, he asserts that the expert witness's testimony wasn't sufficient evidence for the jury to have found that the substance was a controlled substance analogue. Second, he claims the government didn't prove he "intended" to distribute the substance for human consumption. Third, he contends that the government didn't present sufficient evidence to satisfy the knowledge element of the crime. We agree with Belk's third argument.

Although we review the denial of a motion for judgment of acquittal de novo, a jury's guilty verdict must be upheld if, "viewing the evidence in the light most favorable to the government, substantial evidence supports it." *United States v. Wolf*, 860 F.3d 175, 194 (4th Cir. 2017) (cleaned up). "Substantial evidence is evidence that a reasonable finder

12

of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* (cleaned up). A defendant contending that there was insufficient evidence to support his guilty verdict "must overcome a heavy burden," as "reversal for insufficient evidence is reserved for the rare case where the prosecution's failure is clear." *Id.* (cleaned up).

To convict Belk of possession with intent to distribute a controlled substance analogue, the government had to prove that Belk

> (1) distributed a substance that had the chemical structure of an analogue and the actual, intended, or claimed physiological effects of an analogue; (2) intended that the substance be used for human consumption; and (3) knew either the legal status of the substance, or the chemical structure and physiological effects of that substance.

*McFadden*, 823 F.3d at 223.

The government easily established the first element. At trial, an expert witness testified that the substance officers found was N-Ethylpenylone, an "analogue" of two Schedule I substances (pentylone and cathinone). When asked whether N-Ethylpentylone is substantially similar to pentylone and cathinone, she said yes. Although the expert didn't directly testify that the substance had a *chemical* structure substantially similar to pentylone and cathinone, the jury could reasonably infer so based on her answers.

Elements two and three require us to determine aspects of Belk's mental state: his intent and knowledge. The government can prove mens rea using circumstantial evidence, including "a defendant's concealment of his activities, evasive behavior with respect to law enforcement, knowledge that a particular substance produces a 'high' similar to that produced by controlled substances, and knowledge that a particular substance is subject to

13

seizure at customs." *McFadden v. United States*, 576 U.S. 186, 192 n.1 (2015). Although pieces of such evidence may be ambiguous, a jury may take them "in context and evaluate[] as to whether they in fact contribute to scienter." *United States v. Ali*, 735 F.3d 176, 189 (4th Cir. 2013).

With this in mind, and viewing the evidence most favorably towards the government, we find substantial evidence of intent to distribute for human consumption. The substance was wrapped into several small packages, and a detective testified he had "seen narcotics packaged in this manner." J.A. 598. Cathcart also testified that she thought the substance was "crack cocaine," and that Belk had given her and her brother crack cocaine previously. J.A. 778, 782, 794. And the expert witness testified that this type of substance was "sold on the street and people ingest them." J.A. 624. Any reasonable jury could infer that the individualized packaging, Belk's previous actions, and the typical practice of people buying this substance to ingest established Belk intended to distribute for human consumption.

But the government's case fails on the third element—the scienter requirement. The government had two pathways to prove its case. It could prove Belk "knew that the substance [was] some controlled substance—that is, one actually listed on the schedules or treated as such by operation of the Analogue Act—regardless of whether he knew the particular identity of the substance." *McFadden*, 823 F.3d at 223 (cleaned up). Or the government could show that Belk "knew the specific analogue he was dealing with, even if he did not know its legal status as an analogue." *Id.*

14

Even looking at the record in the most favorable light to the government, there isn't substantial evidence to uphold Belk's conviction.  The government presented no evidence that Belk knew the substance was controlled or that he knew its "chemical structure and physiological effects." *Id*.  Cathcart's testimony that she believed the substance was drugs isn't enough.  The government neglected to ask her why she believed the substance was drugs, connect the drugs found on her to the substance in Belk's car, or establish any other trace of evidence to reveal Belk's knowledge.  This is the rare case in which the failure of proof is clear.

Thus, we vacate the judgment as to Count Four, and remand with instructions that the district court enter a judgment of acquittal on that count and resentence accordingly. *See United States v. Hickman*, 626 F.3d 756, 773 (4th Cir. 2010) (ordering resentencing when vacating a conviction due to insufficient evidence).

We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED IN PART, VACATED IN PART, AND*
*REMANDED FOR RESENTENCING*