*Reginald Lincoln Leo, Jr. v. State of Maryland*, No. 2506, September Term, 2023. Opinion by Graeff, J.

**DUE PROCESS PROTECTIONS FOR EXTRAJUDICIAL IDENTIFICATIONS**

Due process protects the accused against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures. When appellant's photo in a photo array included a minor difference in the background that was noticeable only on a close look, his photo did not "stand out" or "differ significantly" from the others in the group in a way that rendered the photo array impermissibly suggestive.

Under the totality of the circumstances, the circuit court did not err in finding that appellant did not meet his burden of proving that the identification procedure was impermissibly suggestive.

Although due process concerns regarding extrajudicial identifications typically involve police conduct, similar concerns could arise from an unnecessarily suggestive identification procedure arranged by a prosecutor. In this case, however, where the witness's viewing of appellant in the courtroom was not for purposes of an identification, but for trial, which was then continued on defense counsel's motion, the State does not engage in improper conduct, and the circuit court properly found that the identification was not based on an impermissibly suggestive identification procedure.

Circuit Court for Washington County
Case No. 21-K-15-051038

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 2506

September Term, 2023

_____


REGINALD LINCOLN LEO, JR.

v.

STATE OF MARYLAND

_____

Graeff,
Ripken,
Eyler, Deborah S.
   (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Graeff, J.
_____

Filed: December 18, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

\* Beachley, J., did not participate in the Court's
decision to designate this opinion for publication
pursuant to Md. Rule 8-605.1.

On January 21, 2016, a jury in the Circuit Court for Washington County convicted Reginald Lincoln Leo, Jr., appellant, of armed carjacking, two counts of first-degree assault, two counts of armed robbery, two counts of reckless endangerment, car theft, two counts of theft under $1,000, and use of a firearm in the commission of crime of violence. The court sentenced appellant to 20 years of imprisonment on the conviction for first-degree assault, all but ten years suspended, and it imposed a concurrent 20-year sentence, all but ten years suspended, on the second conviction for first-degree assault, a 30-year consecutive sentence, all but ten years suspended, on the conviction for armed carjacking, and a ten-year consecutive sentence, all but five years suspended, on the conviction for use of a firearm in the commission of a crime of violence. The court imposed no sentence on the remaining convictions. On February 12, 2024, the circuit court entered a consent order granting appellant leave to file a belated appeal.

On appeal, appellant presents the following questions for this Court's review, which we have rephrased slightly, as follows:

1. Did the circuit court err in admitting extrajudicial identifications arising from an impermissibly suggestive photo-array procedure where the evidence at trial negated independent reliability of the identifications?

2. Did the circuit court err in admitting an in-court identification where an avoidable pretrial courtroom sighting amplified the taint from a defective photo-array procedure?

3. Was the evidence sufficient to support appellant's weapon-related convictions?

For the reasons set forth below, we shall affirm the judgments of the circuit court.

**FACTUAL AND PROCEDURAL BACKGROUND**

On December 17, 2014, at approximately 11:30 p.m., Jacqueline Slusher and Anthony Rubino finished their shift at work. They subsequently went to McDonald's. After Ms. Slusher parked her vehicle in the McDonald's parking lot, a man, later identified as appellant, approached the driver's side of the vehicle. Ms. Slusher "cracked the door slightly," and the man asked Ms. Slusher for money. Ms. Slusher turned around toward the glove compartment to get money, and when she turned back around to hand appellant the money, she noticed a handgun in the crevice of the open door of the car. Appellant ordered Ms. Slusher and Mr. Rubino out of the car and told them to walk to Sheetz. He then drove away in Ms. Slusher's vehicle. Ms. Slusher's cell phone and wallet remained in the vehicle.

Members of the Hagerstown Police Department arrived at Sheetz, and they tracked Ms. Slusher's cell phone to a location in Montgomery County. Montgomery County police officers found the vehicle, set up surveillance on the vehicle, and subsequently arrested appellant.

After the arrest, Detective Jesse Duffey, a detective with the Hagerstown Police Department, created a photo array. He presented the array to Ms. Slusher and Mr. Rubino, and they identified appellant's photograph.

On July 9, 2015, the date that trial was scheduled to begin, defense counsel moved for a continuance based on evidence the State sent that morning.[1] Defense counsel stated

_____

[1] On April 9, 2015, appellant filed several motions, including motions to suppress any in-court identification, all evidence obtained by police "as a result of an illegal search

2

that, "because there [were] pretrial identification" issues, he wanted appellant to remain outside of the courtroom. The court stated that the continuance proceeding needed to occur in appellant's presence. Defense counsel then requested that all witnesses, including Mr. Rubino and Ms. Slusher, be asked to leave the courtroom. The court declined the request. Appellant entered the courtroom, and the court granted the motion for a continuance, finding good cause. After the hearing, Mr. Rubino told the State: "[T]hat's him, that's . . . the guy who carjacked us."

On September 3, 2015, trial began. Mr. Rubino identified appellant as the person who approached him with a gun on December 18, 2014. On cross-examination, Mr. Rubino acknowledged that the suspect approached the car from Ms. Slusher's side, and he did not get a good look at the suspect's face until he got out of the car. Defense counsel then asked Mr. Rubino about the July 9, 2015 continuance hearing, where Mr. Rubino identified appellant. Mr. Rubino denied that his prior courtroom encounter with appellant affected his ability to remember what the suspect looked like, stating: "I know what he looked like." Mr. Rubino acknowledged that, when he looked at a photo array on an earlier date, he picked appellant's picture, stating that he was 85 percent sure that was the person who approached him in the McDonald's parking lot. On re-direct examination, the State asked Mr. Rubino if he had identified appellant because he was sitting at the defendant's table.

---

and seizure," and all statements and confessions taken from appellant by the police. Appellant subsequently withdrew these motions, without prejudice, at a motions hearing on April 15, 2015.

Mr. Rubino responded: "No, no, no definitely not. I wouldn't do that."

That evening, a juror advised the court's bailiff that she felt forced by other jurors to "say yes to achieve a verdict." The juror left and refused to return, leaving the jury with less than 12 members. The following day, the court declared a mistrial and set the case for retrial.

## I.

## Motion to Suppress

On November 5, 2015, prior to retrial, appellant's new defense attorney filed a Motion to Suppress Identification. He asserted that all extrajudicial and in-court identifications resulting from either the "pre-trial confrontation" on July 9, 2015, or "identification made by any witness shown a picture" of appellant should be suppressed because the pre-trial confrontation and photographs of appellant were unduly suggestive.

On January 15, 2016, the court held a hearing on appellant's motion. With respect to the photo array, Detective Duffey testified that he created an array of six photos, one of which depicted appellant. He created the photo array by importing appellant's picture to the Maryland Image Repository System ("MIRS"). Using facial recognition software, MIRS identified individuals with a "similar facial structure as" appellant, using booking photos, and photos from databases at the Maryland Motor Vehicle Administration and the Department of Corrections ("DOC").

Detective Duffey acknowledged that, unlike the backgrounds in the filler photos, the "right quarter" of the background in appellant's photo featured a "cinderblock wall that

4

is painted."[2] Appellant's facial direction and facial expression, however, were the same as those depicted in the other photos.

On December 19, 2014, Detective Duffey traveled first to Ms. Slusher's home and then to Mr. Rubino's home to present the photo array. Detective Duffey used the same photos for each array, but he re-ordered the photos before each showing. Ms. Slusher identified appellant with 80% certainty, and Mr. Rubino identified appellant with 85% certainty.

As discussed in further detail, *infra*, the court found that the identification procedure used to conduct the photo array was not impermissibly suggestive. It denied the motion to suppress the photo array.

The court then heard defense counsel's motion to preclude Mr. Rubino's in-court identification of appellant. As will be discussed in further detail, *infra*, the court indicated that it would rule on the issue at trial.

## II.

## Trial

On January 20, 2016, appellant's two-day trial began. Multiple witnesses testified.

---

[2] As Detective Duffey searched for individuals with a similar facial structure to appellant, three pictures of appellant populated his search. One of the pictures of appellant did not have a "cinderblock looking background."

5

## A.

## Jacqueline Slusher

Ms. Slusher testified that, on December 17, 2014, at approximately midnight, she drove to a McDonald's, with her co-worker, Mr. Rubino. They picked up their order and parked in the McDonald's parking lot.

As Ms. Slusher and Mr. Rubino sorted through their food, she noticed the figure of a man approaching her car. She thought that the man might be looking for directions or money, so she "cracked the door [to her car] slightly" and asked the man if she could help him. The man asked for fifty cents, and Ms. Slusher asked Mr. Rubino for her wallet. She pulled out several dollars, turned to give them to the man, and realized that a gun was inside the door, pointing at her. Although Ms. Slusher was not "totally familiar with guns," she stated that the object was "some type of handgun," and it was small and black or brown.

The man ordered her out of the car, and he told her to leave her belongings. Ms. Slusher exited the vehicle, leaving behind her phone, keys, and wallet. It was dark, but there were lights in the parking lot, and she was able to see the man's entire body once she exited the car. The man was African-American, not much taller than her, and wearing a black jacket "with red in it." His head was covered with either the hood of his jacket or a hat, and he had facial hair. During her interaction with the man, she was "staring constantly at his lips and watching the words come out to just try to accommodate anything that he asked."

6

The man ordered Mr. Rubino to get out of the car, and Mr. Rubino walked over to where the man and Ms. Slusher stood. The man ordered them to walk toward Sheetz and told them not to look back at him. Ms. Slusher saw the car exit the parking lot and turn onto the highway, heading away from Hagerstown.

The following day, Detective Duffey came to Ms. Slusher's house to administer a photo lineup. She looked at each photo and made an identification, stating that she was 80% certain she had identified the perpetrator. She then called Mr. Rubino and told him that Detective Duffey was coming to his house to administer the same photo lineup. She did not tell Mr. Rubino who she picked from the lineup or that she identified someone.

**B.**

**Cody Brandl**

Cody Brandl testified that, after finishing his shift at work, he went to McDonald's. While Mr. Brandl waited in the drive-through line, an African-American man approached his driver's window and tried to get him to roll his window down. Mr. Brandl ignored the man, and the man walked away toward the parking lot.

Mr. Brandl felt bad about ignoring the man, so he backed out of the drive-through line and observed the man speaking to a woman and a man. He estimated that the encounter lasted "two or three minutes if that." He did not know whether the man who had approached his car had a weapon because he "couldn't see anything" given the time of night and the distance between them. He saw the man raise up his arms "like he was going to do something but didn't."

Mr. Brandl saw the two people who had been approached by the man "take off running" toward Sheetz, and he saw the man "hop in the car and take off." Mr. Brandl drove to Sheetz and asked the people if they had been carjacked. They said yes, and Mr. Brandl decided to take his car down the road to determine whether he could "see the [stolen] car going anywhere." When he could not find the car, he returned to the McDonald's parking lot and called the police.

## C.

### Motion to Suppress In-Court Identification

At the conclusion of Mr. Brandl's testimony, and prior to Mr. Rubino's testimony, defense counsel moved to suppress any in-court identification by Mr. Rubino. Defense counsel argued that, subsequent to Mr. Rubino's photo array identification in 2014, where Mr. Rubino identified appellant and stated that he was 85% sure, Mr. Rubino had observed appellant in court during a continuance hearing on July 9, 2015, where he identified appellant with a high percentage of certainty. Counsel argued that Mr. Rubino's subsequent identification to the State, after this in-court observation, tainted any future in-court identification. Counsel stated that the defense had also recently learned that Mr. Rubino had communicated with Ms. Slusher between Ms. Slusher's review of the photo array and Mr. Rubino's review of the photo array.

The court found that the identification at the continuance hearing on July 9, 2015, was not impermissibly suggestive. The court, however, allowed defense counsel to conduct

8

an inquiry of Mr. Rubino concerning the telephone call between him and Ms. Slusher.[3]

After hearing Mr. Rubino's testimony, the court found that appellant had not met his

burden of "showing a potential taint of the identification of the photo array." The court

found that there was nothing impermissible about the prior identifications, but defense

counsel could cross-examine Mr. Rubino on the effect of seeing appellant on the other

occasions.

**D.**

**Anthony Rubino**

Mr. Rubino testified that he and Ms. Slusher drove to McDonald's after their work

shift. They pulled into the McDonald's parking lot to sort through their food. A man

approached the car window, and Ms. Slusher opened the door to hear what he was saying.

The man asked for fifty cents, and Ms. Slusher asked Mr. Rubino to get her wallet. Then,

"out of the blue," the man told Ms. Slusher to get out of the car. After Ms. Slusher exited

the car, he asked Mr. Rubino to come around to the other side of the car. He pointed a gun

---

[3] Mr. Rubino testified, outside the presence of the jury, that Detective Duffey called him to arrange for him to view a photo array. Detective Duffey arrived at Mr. Rubino's house an hour later. Ms. Slusher called Mr. Rubino to tell him that Detective Duffey was going to Mr. Rubino's house, and she told him that she had looked at a photo array. Mr. Rubino did not ask Ms. Slusher whether she had identified anyone. When Detective Duffey arrived, Mr. Rubino looked at the pictures, and he identified a photo with 85% certainty. Mr. Rubino initially stated that Detective Duffey then said: "[T]hat's the right guy cause [Ms. Slusher] identified him too." When subsequently asked if Detective Duffey told him "that's the right guy," however, Mr. Rubino said: "No, no, no, no. No, I'm sorry. When I looked at it . . . I said – that's him."

at Mr. Rubino and "asked [him] to put everything in the front seat. And he said - turn around and don't look at me." Mr. Rubino put his wallet on the front seat.

Mr. Rubino described the gun as small and black, but he noted that he was "not too familiar with guns." He was able to see appellant's face "[f]or a good little while." Appellant was wearing a "red/black jacket" with a hoodie pulled over his head. Mr. Rubino identified appellant in court as the perpetrator.

Appellant drove away in Ms. Slusher's car, and Mr. Rubino and Ms. Slusher ran over to Sheetz. Mr. Rubino saw the car turn onto the highway.

A day or two after the incident, Detective Duffey presented Mr. Rubino with a photo array. Before Detective Duffey arrived, Ms. Slusher called Mr. Rubino to warn him that the detective was on his way. Mr. Rubino picked out appellant from the photos, stating that he was 85% certain that was the person. He "looked at every photo carefully . . . but [he] knew that . . . was the one." He stated that he had previously been in a courtroom with appellant, but he was "identifying [appellant] because [he] saw [appellant's] face that night when it happened."

Mr. Rubino testified that, on July 9, 2015, he saw appellant in the courtroom, sitting at the defense table next to his lawyer. He "knew who [appellant] was the minute he saw him."

## E.

### Officer Charles Johnson

Officer Charles Johnson, an officer with the Hagerstown Police Department, testified that, on December 18, 2014, shortly after midnight, he responded to a report of an armed carjacking. When he arrived, Ms. Slusher gave him a description of the suspect and the stolen vehicle. Officer Johnson broadcast these descriptions to other units. Ms. Slusher did not provide him any description of a gun.

Ms. Slusher stated that her cell phone was inside the stolen vehicle, and it was turned on. Officer Johnson provided that information to dispatch to facilitate a location trace on the phone.

## F.

### Officer Cory Biden

Officer Cory Biden, an officer with the Hagerstown Police Department, also responded to the Sheetz. He took Ms. Slusher and Mr. Rubino to the police station to get their written statements. Ms. Slusher described the suspect as a black male with a goatee, small build, and wearing a red jacket. She described the handgun as black and straight on the top and the bottom. Officer Biden concluded that the handgun was possibly a semi-automatic weapon.

## G.

## Montgomery County Police Officers

Officer Matthew McGowan testified that he received a call during the early morning hours of December 18, 2014, asking Montgomery County officers to search for a vehicle related to an armed carjacking. He received a possible location for the vehicle based on a cell phone "ping."[4] Officer McGowan and several other officers began driving in the area, and they asked that the cell phone be "re-pinged." They received an updated search area, and they identified the vehicle, which was unoccupied at that time. Officer McGowan recovered a credit card with Mr. Rubino's name on it from the area surrounding the vehicle. He did not observe a gun in the vehicle, and no gun was recovered from the area where the car was parked.

Captain Paul Liquorie requested that a plainclothes unit be assigned to conduct surveillance on the vehicle. While he was waiting for the unit to arrive, Captain Liquorie observed the vehicle leave its location, and he followed it. He initiated his lights and siren to stop the vehicle, "but it continued to go at a high rate of speed." Other units eventually took over the pursuit.

Officer Jeffrey Brewer received word that the suspect vehicle was heading toward his location. He pursued the vehicle for approximately 25 minutes, but the vehicle failed

---

[4] "[A] cell phone reveals its general geographical location whenever it sends or receives a call or text message. If one 'pings' a cell phone—that is, sends signals to the phone—the phone may reveal its general geographical location at frequent, predictable intervals." *State v. Copes*, 454 Md. 581, 621 n. 59 (2017).

to stop.[5] The police deployed "stop sticks,"[6] but the vehicle continued moving until it "lost it" and went into a spin. Officers removed appellant from the vehicle and took him into custody.

Officer Evan Clarke also took part in the pursuit. The sole occupant of the vehicle, the driver, was a black male "with very little to no hair," which matched the description previously provided to the officers. When the driver exited the vehicle, Officer Clarke observed a bald-headed black male with a short beard, who was wearing a red and black jacket. Officer Clarke identified appellant in court as the driver of the vehicle. He testified that he took two photos of appellant at the police station.

Officer Amber Richard collected the victim's personal property, and she submitted evidence that Officer Clarke had retrieved from appellant. She submitted a black and red jacket and a mask to the property room at the police station.

## H.

### Detective Jesse Duffey

Detective Duffey created a photo array after he obtained the photographs of appellant taken shortly after appellant was taken into custody. He created the array by inputting appellant's photo into the MIRS. Detective Duffey selected six photos for the

---

[5] The dash cam video from Officer Brewer's vehicle was admitted into evidence.

[6] Stop sticks are used during a pursuit as a means of disabling a vehicle. If the driver of the suspect vehicle runs over them, they create holes in the suspect's tires, and the tires slowly deflate. Eventually, the tires begin shredding, and the vehicle begins to ride on its rims.

array, one of appellant and five of other black males. Pursuant to the Hagerstown Police Department rules and regulations, he assembled the array by putting a single photograph into a manila envelope until each photograph was in its own manila envelope.[7]

Detective Duffey presented the photo array to Ms. Slusher and Mr. Rubino at their respective homes, but he re-ordered the photographs between presentations. Before presenting the photo array to each witness, Detective Duffey read the standard instructions, including that the witness should not allow him to see the photos. Ms. Slusher looked through the array first, and she did not allow Detective Duffey to see the photos. Ms. Slusher opened one of the envelopes and "immediately her eyes got very big," she "held the photograph in front of her for several seconds," and she stated "it's his lips." Detective Duffey directed Ms. Slusher to look at the remainder of the photos. She identified appellant, stating that she was 80% sure. Mr. Rubino also identified appellant, stating that he was 85% sure.

Detective Duffey agreed with defense counsel that the background of appellant's photo featured "a small portion of a cinderblock wall," which was not present in the other photographs. Another photograph of appellant, which had a solid blue background, was available for Detective Duffey to use, but he chose not to use it for the photo array because

---

[7] Pursuant to the Hagerstown Police Department rules and regulations, the first manila envelope and the eighth manila envelope, the final envelope, included a blank piece of paper.

he "felt [it] would be very suggestive with the bright blue background compared to the light-colored backgrounds in the photo array."[8]

## I.

## Motion for Judgment of Acquittal

At the conclusion of the State's case, appellant moved for judgment of acquittal on the counts involving a gun or firearm, including armed carjacking, armed robbery, and assault in the first degree. He asserted that the evidence presented could not "reasonably and sufficiently describe a gun" as defined by statute.

The State noted that two witnesses testified that they saw a gun, and Officer Biden testified that the witnesses described a black handgun. It argued that, based on this evidence, "the counts should survive."

The court agreed with the State. It denied appellant's motion for judgment of acquittal. The defense rested without presenting evidence.

## J.

## Verdict

As indicated, the jury found appellant guilty of armed carjacking, assault in the first degree, armed robbery, reckless endangerment, car theft, theft under $1,000, and use of a firearm in the commission of a crime of violence. This appeal followed.

---

[8] The second photo of appellant came from the MVA database.

# DISCUSSION

## I.

## Photo Array Identifications

Appellant contends that the court erred in denying his motion to suppress the photo array identifications made by Ms. Slusher and Mr. Rubino. He argues that they were tainted by impermissibly suggestive procedures, and the witnesses' trial testimony showed that the identifications were unreliable.[9]

The State contends that, to the extent appellant's arguments are preserved, the court properly denied the motion to suppress the identifications made after viewing the photo

---

[9] Appellant makes an additional argument in his reply brief, which was not made below or in his opening brief. He argues that the Supreme Court of Maryland "announced a material change in Maryland's Due Process standard for assessing the admissibility of eyewitness identifications in" *Small v. State*, 464 Md. 68, 86-87 n. 21 (2019), by indicating that courts should consider any "system and estimator variables" under the totality of the circumstances, and therefore, this Court should conduct plain error review of the issue "under the now-controlling *Small* standard." We decline to review this issue for several reasons: (1) the issue was raised for the first time in the reply brief, *see Gazunis v. Foster*, 400 Md. 541, 554 (2007) (we generally do not consider issues raised for the first time in a reply brief); (2) this is not the type of issue warranting plain error review, *see Morris v. State*, 153 Md. App. 480, 507 (2003), *cert. denied*, 380 Md. 618 (2004) (appellate invocation of the plain error doctrine is "a rare, rare phenomenon"); and (3) *Small* specifically said that it was not changing the law for assessing the admissibility of eyewitness identifications. 464 Md. at 87.

arrays.[10] The State argues that, with respect to the due process argument, the court properly found that the photo array was not impermissibly suggestive.

## A.

### Proceedings Below

At the conclusion of the testimony regarding the motion to suppress the identification from the photo array, defense counsel argued that the photo array was impermissibly suggestive because a portion of appellant's photo had a non-solid background, i.e., a cinderblock wall. Counsel asserted that the background made the photo look like "a booking photo," and many people would recognize the cinderblock wall "as having been in a police department, or some location that . . . shows that he was detained somewhere." Counsel noted that, although the difference between appellant's photo and the others in the array was subtle, "subtlety can still affect the witness's ability to identify it."

The State argued that the array was not impermissibly suggestive, noting that the process for selecting photographs for a photo array is objective because MIRS identifies photos "that most closely match the characteristics of the person that you have submitted." It asserted that all of the photographs in the array had backgrounds that were "a little bit

---

[10] With respect to preservation, the State argues that the arguments based on local police procedures and statutory requirements were not raised below, and the only issue preserved for appeal is whether the photos were impermissibly suggestive for due process purposes. In appellant's reply brief, he states that the alleged violations of statutory requirements and police protocol are raised only in the context of its argument that the photo array was impermissibly suggestive for purposes of due process. Accordingly, we will limit our analysis to the due process claim.

different," and two photographs depicted men wearing orange, which was most akin to a booking photo. It noted that the witnesses viewed the photographs individually, i.e., one at a time, and "by the time" either witness "closed the folder and turned it over . . . the background [was] not what these witnesses [were] looking for."

The court found that the identification procedure was not impermissibly suggestive. It noted that, because MIRS used facial recognition software to identify similar-looking individuals, the "human element" had been taken out of the process, and there was "nothing wrong with the photographs" of the individuals used in the photo array. The court stated that there was nothing impermissibly suggestive about Detective Duffey conducting the photo array at Ms. Slusher's house and then at Mr. Rubino's house, noting that the photograph of appellant was in a different position for each witness. The court agreed that appellant's photograph was different in that it was the only photograph featuring a cinderblock wall in the right margin. It stated, however, that, "if we are as a criminal justice system going to determine that one photograph with the right margin having a cinderblock creates impermissible suggestiveness, then I think we're all in trouble as a society." The court found that appellant had not met his burden to demonstrate that the identification procedure was impermissibly suggestive, and it denied the motion to suppress the identification based on the photo array.

## B.

## Standard of Review

Suppression rulings "present a mixed question of law and fact." *Thornton v. State*, 465 Md. 122, 139 (2019). "In assessing the admissibility of an extrajudicial identification, we look exclusively to the record of the suppression hearing and view the facts in the light most favorable to the prevailing party." *In re D.M.*, 228 Md. App. 451, 473 (2016). "We accept the circuit court's factual findings unless they are clearly erroneous, but extend no deference to the circuit court's ultimate conclusion as to the admissibility of the identification." *Id.* The determination whether an identification procedure is suggestive is a question of law that we review *de novo*. *See Small v. State*, 464 Md. 68, 88 (2019) (conducting constitutional evaluation of identification procedure); *Accord United States v. Radaker-Carter*, 151 F.4th 840, 846 (6th Cir. 2025) ("When reviewing a district court's decision on a motion to suppress pretrial identification evidence, . . . we apply de novo review to the court's conclusions concerning whether the circumstances giving rise to the identification were unnecessarily suggestive and whether the identification was otherwise reliable.").

## C.

## Analysis

"Due process protects the accused against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures." *Small*, 464 Md. at 82-83 (quoting *Jones v. State*, 310 Md. 569, 577 (1987)).

"When an accused challenges the admissibility of an extrajudicial identification procedure on due process grounds, Maryland courts assess its admissibility using a two-step inquiry." *Id.* at 83 (footnote omitted). This inquiry "seeks to determine whether the challenged identification procedure was so suggestive that the identification was unreliable." *Id.*

In the first step of the inquiry, the court "must evaluate whether the identification procedure was suggestive," and the defendant "bears the burden of making a *prima facie* showing of suggestiveness." *Id.* "If the procedure is not impermissibly suggestive, then the [due process] inquiry ends." *Smiley v. State*, 442 Md. 168, 180 (2015). "[W]ithout the taint of improper state conduct," there is no due process requirement for a court to screen an identification for reliability before allowing the jury to assess its credibility. *Perry v. New Hampshire*, 565 U.S. 228, 245 (2012). Rather, in the absence of an impermissibly suggestive identification procedure:

> the reliability of the witness's identification is a question for the jury, leaving the defendant with the typical protections against unreliable evidence: the right to persuade the jury of the evidence's lacking reliability through the cross-examination of witnesses, general rules governing the admissibility of evidence, and jury instructions on "the fallibility of eye-witness identification."

*Bean v. State*, 240 Md. App. 342, 355 (2019), *cert. denied*, 464 Md. 591 (2019) (quoting *Perry*, 565 U.S. at 233).

If the court determines that the identification procedure was unnecessarily suggestive, then the second step is implicated, and the court must determine "whether,

20

under the totality of the circumstances, the identification was reliable." *Small*, 464 Md. at 83-84. In assessing whether an extrajudicial identification is reliable, the court considers the following five factors:

> (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation.

*Greene v. State*, 469 Md. 156, 169 (2020) (quoting *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)). At this stage, the State must show by clear and convincing evidence that the identification was reliable. *Small*, 464 Md. at 84.

In addressing appellant's claim that the identification procedure was impermissibly suggestive, we note that the due process analysis does not prohibit "all suggestiveness but only impermissible suggestiveness." *Anderson v. State*, 78 Md. App. 471, 494 (1989). An identification procedure is impermissibly suggestive where the police "feed the witness clues as to which identification to make." *Conyers v. State*, 115 Md. App. 114, 121, *cert. denied*, 346 Md. 371 (1997). *Accord Small*, 464 Md. at 88 (identification procedure is impermissibly suggestive when the police give "the witness a clue about which photograph the police believe the witness should identify as the perpetrator during the procedure"). An identification procedure is impermissibly suggestive "where the police, in effect, repeatedly say to the witness: 'This is the man.'" *In re Matthew S.*, 199 Md. App. 436, 448 (2011) (quoting *McDuffie v. State*, 115 Md. App. 359, 366-67 (1997)).

21

In *Small*, 464 Md. at 91, the Supreme Court of Maryland held that a photo array was unduly suggestive, noting first that the defendant's photo was "emphasized during the first photo array" because he was "the only person in the first array who had a tattoo visible on his neck." Additionally, the defendant's photo was included in a second array. *Id.* The Court stated that the "implicit suggestion inherent in repeating [the defendant's] photo with his distinct tattoo" was "bolstered by the fact that [the witness] recalled being told that the second array was 'to make sure this was the same person,'" after the witness stated that the defendant "'looked like' the assailant as depicted in the first array." *Id.* It held that the second array was unduly suggestive because police emphasized the defendant's photo in the first array and repeated his photo in the second array, thereby "impliedly suggest[ing]" that the witness "should identify [the defendant] as the assailant." *Id.* at 92.

By contrast, in *Smiley*, 442 Md. at 180-82, the Supreme Court of Maryland held that a six-person photo array was not impermissibly suggestive when four of the photographs, none of which included Smiley, featured individuals with elongated heads and torsos. The Court held that "the elongation of the four photographs, other than that of Smiley's photograph, did not [intrinsically] suggest to [the witness] that Smiley was the perpetrator," and therefore, the "dissimilarity related to the elongation of the four photographs and those depicting Smiley and another man did not render the photo array impermissibly suggestive." *Id.* at 182.

We turn now to appellant's argument that the photo array identification procedure here was impermissibly suggestive. He contends that the identification procedure was

impermissibly suggestive for multiple reasons, including: (1) appellant's photo was the "only photo depicting the subject against a white wall with horizontal markings in the style of a cinderblock wall," which was both "reminiscent of a mugshot" and presented a stark contrast with the "blank, solid-color, 'green-screen'-like backgrounds of the other photos"; (2) appellant's photo depicted a "subject who did not face the camera full on, eyes level, but rather turned his head to a side with a morose look"; (3) the small number of photos used in the array, six total, "aggravated the suggestiveness of the aberrations" in appellant's photo; and (4) Detective Duffey stated "that's the right guy" after Mr. Rubino selected appellant, noting that Ms. Slusher had also selected him. Appellant contends that, "under the ambit of Due Process," Detective Duffey's behavior violated Hagerstown Police Department protocol, U.S. Department of Justice Guidelines, and Md. Code. Ann., Pub. Safety ("PS") § 3-506(a).[11]

The State contends that the circuit court properly found that the minor differences in the background and facial expression of appellant's photo were not impermissibly suggestive. It argues that, although "some subtle differences between the photos" existed, those differences did not suggest that appellant was the perpetrator, and the size of the array did not make the identification procedure impermissibly suggestive.

We address first the differences between backgrounds and facial expressions. In addressing whether such differences make a photo array impermissibly suggestive, other

---

[11] As indicated, appellant does not argue, and we do not address, other than as it implicates the issue whether the photo array was impermissibly suggestive, the alleged failure of Detective Duffey to follow procedural or statutory directives.

courts focus on whether the differences make the defendant stand out. *See, e.g.*, *People v. Wilson*, 484 P.3d 36, 56 (Cal. 2021) ("Standing out requires more than . . . having a photo background slightly different than other images in the array."); *Latham v. State*, 299 So.3d 768, 774 (Miss. 2020) ("'[M]inor differences' with the suspects or differences in the photograph backgrounds will not render a lineup impermissibly suggestive."); *United States v. Wiseman*, 172 F.3d 1196, 1209 (10th Cir. 1999) (photo of defendant with "prominent dark circles under his eyes" and "an extremely unnatural, chalk-white pallor," compared with the "natural" looking skin tones in the photos of the other five persons in the array, made defendant's picture "stand[] out prominently from the others in the array").

Appellant cites *United States v. Saunders*, 501 F.3d 384, 390 (4th Cir. 2007) in support of his argument. In that case, the United States Court of Appeals for the Fourth Circuit held that the photo array was impermissibly suggestive when the defendant's photo "stood out sharply" from the other photos in the array because the dark background and lack of overhead lighting gave the defendant "a menacing countenance that was lacking in the men in the other five photos." *Id.* Because the defendant's photo "differed significantly from the others as a group," the suggestion to the viewer could be that the defendant's photo "was taken at a different time and place than the rest." *Id.* The Court recognized that, although "there may be differences in background and lighting among the various photos in an array, and such differences do not automatically create impermissible suggestiveness," the "risk of suggestiveness comes when one photo stands out." *Id.*

24

Here, appellant's photo does not "stand out" or "differ significantly" from the others in the group. The filler photos depict men of a similar build, age, and complexion. Each man has similar facial hair, is either balding or completely bald, and has a similar facial expression.[12] The photos have varying background colors. To be sure, the background of appellant's photo is the only one that is not a solid color, with the right margin of the photo showing a cinderblock wall. We note, however, that the small portion of the photo showing a cinderblock wall is noticeable only on a close look. This minor difference does not make appellant "stand out" from the filler photos, nor does it suggest to the viewer that appellant is the perpetrator. The minor difference in background did not render the photo array impermissibly suggestive. This is particularly true because each photo was shown separately, and the witnesses may not have even noticed the difference.

We next consider appellant's argument that the number of photos in the array "aggravated the suggestiveness of the aberrations" in appellant's photo. As the State notes in its brief, the array met the requirements of Maryland law. *See* PS § 3-506.1(c) (in an identification procedure, "at least five fillers, in addition to the suspect, shall be included when an array of photographs is displayed to an eyewitness"). Although some Courts consider the size of an array in reviewing whether the array is impermissibly suggestive, using six photographs is not impermissibly suggestive in and of itself. *See, e.g.*, *United*

---

[12] Appellant characterizes his photo as "depicting a subject who did not face the camera full on, eyes level, but rather turned his head to a side with a morose look." We note that in appellant's photo, his head is slightly tilted, as is the case in at least one other photo, but appellant's features are fully visible. None of the men in the photos are smiling.

*States v. Daniels*, 97 F.4th 800, 810 (11th Cir. 2024); *United States v. Gershman*, 31 F.4th 80, 94 (2d Cir. 2022), *cert. denied*, 143 S.Ct. 816 (2023). Here, the size of the array was permissible under Maryland law, and it does not render it suggestive.

Finally, we address appellant's argument that the identification procedure was impermissibly suggestive because, after Mr. Rubino selected appellant, Detective Duffey stated "that's the right guy," noting that Ms. Slusher had also selected appellant. Initially, we note that, although Mr. Rubino initially testified that Detective Duffey made that statement, he later clarified that Detective Duffey did not say that. In any event, as the State notes, even if Detective Duffey did say that, the statement was made *after* Mr. Rubino's identification, and therefore, it did not render the identification procedure impermissibly suggestive. *See Commonwealth v. Borgos*, 979 N.E.2d 1095, 1104 (Mass. 2012) (police action of covering defendant's hair in photo array was not impermissibly suggestive because the police did so after the witness made a positive identification).

Under the totality of the circumstances here, the circuit court did not err in finding that appellant did not meet his burden of proving that the identification procedure was impermissibly suggestive. That finding is the end of the inquiry, and we need not address whether the identification procedure was sufficiently reliable. The court properly denied the motion to suppress the extrajudicial identification based on the photo array.

## II.

## In-Court Identification

Appellant next contends that the court erred in denying his motion to suppress Mr. Rubino's in-court identification of appellant. He asserts that Mr. Rubino's observation of him at the July 9, 2015 continuance hearing constituted an extrajudicial identification procedure, and the observation was "impermissibly suggestive because it strengthened the witness's degree of certainty in his subsequent in-court identification without any compelling government need." He argues that the in-court identification "was a fruit of the poisonous tree of the pretrial courtroom confrontation, which, itself, had been tainted by the impermissibly suggestive prior photo-array identification procedure."[13]

The State contends that, to the extent this issue is preserved for this Court's review, the court properly admitted Mr. Rubino's in-court identification. It argues that, because Mr. Rubino's observation of appellant at the earlier continuance hearing was not an identification arranged by law enforcement, the due process analysis does not apply.

## A.

## Proceedings Below

As discussed, *supra*, the parties appeared for trial on July 9, 2015. That morning, defense counsel asked for a postponement based on new evidence disclosed by the State. Defense counsel explained that, "because there [were] pretrial identification" issues, he

---

[13] As indicated, we have rejected the claim that the in-court identification should have been suppressed because the photo array identification procedure was impermissibly suggestive.

wanted appellant to remain outside of the courtroom during the continuance hearing. The court stated that, if it was going to continue trial, appellant needed to be there so it was done in appellant's presence. Defense responded: "Okay, understood." Defense counsel asked if the witnesses could be asked to leave the courtroom. The court denied the request, and the State noted that the victims had "an absolute right to be present" in the courtroom. Defense counsel responded: "Understood, your Honor."[14]

The court then stated that "he comes out or he doesn't come out, but he - - he comes out, it's on him." Defense counsel again stated that he understood. Appellant entered the courtroom, where Mr. Rubino and Ms. Slusher were present. The court found good cause to continue the trial. After the hearing, Mr. Rubino told the State: "[T]hat's him, that's . . . the guy who carjacked us."

Prior to trial, defense counsel argued that Mr. Rubino's in-court identification should be suppressed because the State and the court could have taken steps to ensure that "no witnesses were available to observe" appellant on July 9, 2015 "in light of the fact that the State was aware that neither [Mr. Rubino nor Ms. Slusher] had one hundred percent identified" appellant. Counsel asserted that Mr. Rubino's observation of appellant gave him "an extra ability to then later on identify [appellant], having heard in court that this is [appellant] before the court."

---

[14] We note that, at an earlier proceeding, counsel had waived appellant's right to be present.

The prosecutor acknowledged that defense counsel had objected at the July 9, 2015 hearing and tried "to keep his client out of the courtroom." She explained that she had objected to the request to exclude the victims because the victims "ha[d] an absolute right to be in court" during the proceedings, and the State did not "set this [viewing] up." When the prosecutor explained to the witnesses why the case was continued, Mr. Rubino said "that's him, . . . that's the guy who carjacked us." Mr. Rubino had been permitted, over objection, to identify appellant at the earlier trial that ended in a mistrial.

The court stated that it understood the victims' right to be present, but it thought "the better procedure would have been" to excuse the witnesses for a few minutes so there was not a potential of tainting an identification.[15] The court indicated that it would rule on the issue at trial.

At trial, prior to Mr. Rubino's testimony, defense counsel moved to suppress any in-court identification by Mr. Rubino. Defense counsel noted that Mr. Rubino had identified appellant in a photo array with 85% certainty, but after he attended the postponement hearing on July 9, 2015, and observed appellant in court, he told the State that he could identify appellant with 100% certainty. Counsel argued that any in-court identification should be suppressed "because it [was] tainted with extrajudicial and in-court evidence that help[ed] [Mr. Rubino] form this opinion independent of his own knowledge."

_____

[15] Different circuit court judges presided at the trial and the continuance hearing.

29

The court stated that the defense had the burden "to show suggestiveness." It initially stated that it was going to "assume, arguendo, suggestiveness and have the State put on evidence as far as the[] factors on reliability."

The State argued that Mr. Rubino and Ms. Slusher were in the courtroom appropriately because they "were supposed to start a jury trial." In the prior trial that ended in a mistrial, Mr. Rubino was questioned about seeing appellant at the continuance hearing, and he testified that it did not affect his ability to recognize appellant because he knew "what he looked like." The State had asked Mr. Rubino if he was sure he was not "picking [appellant] out because he's the guy sitting in this chair," and Mr. Rubino responded "oh, no, no, no, no, I wouldn't do that." The State argued that the issue was not the admissibility of an in-court identification, but rather, what weight the jurors should give to it.[16]

The court then found that the identification at the continuance hearing on July 9, 2015, was not impermissibly suggestive. Mr. Rubino was "in the courtroom at that time and happened to see [appellant] there," and after seeing appellant in court, Mr. Rubino stated that he could identify appellant in person with 100% certainty. It found that appellant had not met his burden to show impermissible suggestiveness and any resulting taint.

At the conclusion of all the evidence, the court reaffirmed its ruling that Mr. Rubino's viewing of appellant at the continuance hearing was not "unduly or impermissibly suggestive." The court went on to state that, after hearing all the testimony,

---

[16] The prosecutor stated that appellant's defense counsel at the prior trial agreed with that position.

even if the observation was suggestive, the in-court identification of appellant "was not the product of that pre-trial procedure." The court explained:

> Mr. Rubino was eight-five percent cer-- certain at the photo array. He testified that he had a "good shot of the Defendant's face(")" at the time the crime was being committed. His description of the assailant given to the police is not inconsistent with the Defendant's physical characteristics. He unequivocally testified that when he saw the Defendant in July 2015 at the defense table, he stated – "I knew who he was the minute I saw him." He reiterated his certainty of the Defendant being the assailant at least three times on the stand yesterday. His credibility was enhanced by his demeanor and sincere concern, at least in my observations, not to identify the wrong person.

Accordingly, the court found that Mr. Rubino's in-court identification was reliable.

**B.**

**Preservation**

The State contends that appellant's argument is not preserved for review because counsel failed to argue at the continuance hearing that any viewing by the witnesses would be an impermissibly suggestive identification procedure, and he failed to object to the court's ruling that appellant be present for the continuance hearing and that the witnesses would not be excluded from the courtroom. Although the court may have handled the situation differently if those arguments had been raised below, that does not render the issue unpreserved for our review. The ruling on appeal is the trial court's ruling denying the motion to suppress the in-court identification. Appellant did argue to the trial court that the in-court identification should be suppressed because the viewing at the motion for a

31

continuance was impermissibly suggestive. Accordingly, the issue is preserved for our review, and we will address it on the merits.

We do note, however, that counsel's failure to flesh out the argument at the continuance hearing leaves gaps in the record before us. For example, the record does not reflect whether appellant was brought into the courtroom by court personnel, whether he was handcuffed, whether he was wearing prison clothes, or where he ultimately stood in the courtroom. Even if the presence of a person identified as a defendant in court generally may be considered suggestive, the lack of evidence of the circumstances of his presence in the courtroom makes it difficult for appellant to meet his burden of showing impermissible suggestiveness.

## C.

### Analysis

We turn to the merits of appellant's argument that the circuit court erred in denying his motion to suppress Mr. Rubino's in-court identification based on an impermissibly suggestive identification procedure at the continuance hearing. The State argues that the due process analysis is not implicated here because Mr. Rubino's observation of appellant at this hearing "was not an 'identification' that was arranged by law enforcement."

There is caselaw indicating that due process concerns relating to an extrajudicial identification arise only from improper police conduct. This Court has stated that, to invoke due process protections, "a criminal defendant must first demonstrate that the eyewitness identification was 'procured under unnecessarily suggestive circumstances *arranged by*

32

*law enforcement.*'" *Bean v. State*, 240 Md. App. 342, 345 (2019), *cert. denied*, 464 Md. 519 (2019) (quoting *Perry v. New Hampshire*, 565 U.S. 228, 248 (2012)). "Failure to show state action—that the police-arranged the pre-trial identification—effectively ends the constitutional inquiry." *Id.*

In *Bean*, the police created a "be on the lookout" flyer ("BOLO"), showing images of the assailants of a robbery. *Id.* at 345. The BOLO was released on social media, and after the victim saw it, she advised the police that she recognized her assailants on the flyer. *Id.* This Court held that, although the BOLO was impermissibly suggestive, the police did not arrange the victim's identification of Bean, and therefore, there was no state action requiring suppression of the identification. *Id.* at 346.

In *Perry*, 565 U.S. at 233, a witness called the police to report that a man was breaking into cars in a parking lot. One of the responding officers talked to Perry while the other officer talked with the witness in her apartment. *Id.* at 233-34. The officer asked the witness to describe the man breaking into cars, and she went to her window, pointed, and said he was the man in the parking lot standing next to the police officer. *Id.* at 234. The Supreme Court held that the Due Process Clause did not require a judicial reliability assessment because the identification was not obtained by unnecessarily suggestive circumstances arranged by the police. *Id.* at 245.[17] When no improper police activity is

---

[17] In both *Perry v. New Hampshire*, 565 U.S. 228, 245 (2012), and *Bean v. State*, 240 Md. App. 342, 346 (2019), *cert. denied*, 464 Md. 519 (2019), the Court held that, because the identification was made by suggestive *private* conduct, as opposed to a police-arranged identification, due process protections were not triggered.

involved, "it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt." *Id.* at 233.

Here, the police did not arrange for the identification of appellant at the continuance hearing. Rather, the proceedings were scheduled for the start of trial, and Mr. Rubino was in court as a victim and testifying witness.

Appellant contends that *Perry's* language limiting due process protections to police-arranged identifications is not an impediment to his argument for two reasons. First, he argues: "State constitutions may offer greater protections than the federal constitution, and the Maryland Declaration of Rights does so."  To the extent that appellant is arguing that we should construe due process rights under Article 24 of the Maryland Declaration of Rights differently from the federal constitutional right to due process of law,[18] there are two problems with this argument. Initially, appellant did not raise this issue below, and therefore, it is not preserved for this Court's review. *See* Md. Rule 8-131(a) (an appellate court generally will not decide an issue "unless it plainly appears by the record to have

---

[18] The Due Process clauses of the Fifth and Fourteenth Amendments to the United States Constitution provide that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const. amend V, XIV § 1. Article 24 of the Maryland Declaration of Rights provides: "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

been raised in or decided by the trial court"); *Martin-Dorm v. State*, 259 Md. App. 676, 696-97 (2023) (declining to address the merits of appellant's contention when it did not plainly appear by the record to have been raised in or decided by the trial court).

Moreover, the Supreme Court of Maryland has stated that, "[u]nless there is good reason to do otherwise, 'state constitutional provisions [such as Article 24] are in *pari materia* with their federal counterparts or are the equivalent of federal constitutional provisions or generally should be interpreted in the same manner as federal provisions.'" *Allmond v. Dep't of Health and Mental Hygiene*, 448 Md. 592, 609 (2016) (quoting *Dua v. Comcast Cable of Maryland, Inc.*, 370 Md. 604, 621 (2002)). Although a state constitutional provision may be interpreted differently, *id.*, appellant has not specified any reason to construe Article 24 differently from the federal due process provisions. Accordingly, for this reason as well, we decline to address the argument. *See Johnson v. Spireon, Inc.*, 266 Md. App. 198, 250 (2025) ("A contention can be deemed waived if an appellant in its brief raises an argument but cites no authority for its position."), *cert. denied*, ___ Md. ___ (Oct. 27, 2025); *Anderson v. Litzenberg*, 115 Md. App. 549, 578 (1997) (where a party "cite[s] no authority for their position, their contention was deemed waived."); *Klauenberg v. State*, 355 Md. 528, 552 (199) ("[A]rguments not presented in a brief or not presented with particularity will not be considered on appeal.").

Appellant's second asserted reason why he believes that *Perry's* language limiting due process protections to police-arranged identification is not an impediment for his argument involves cases that he contends support the proposition that, "even absent law

enforcement orchestration, a sighting of the accused at a judicial proceeding, other than the trial of the matter on appeal, constitutes an extrajudicial identification procedure subject to a Due Process challenge." Those cases, however, were decided prior to *Perry*, and they are distinguishable on their facts.

In *Coleman v. State*, 8 Md. App. 65, 73-74 (1969), a witness to a robbery failed to identify Coleman in photographs and a lineup, and the police then brought the witness to Coleman's preliminary hearing, where the judge stated that Coleman was charged with robbery, after which the witness identified Coleman as the robber. *Id.* at 73-74; 77. The record in that case, however, reflected that it was the police who arranged the identification. *Id.* at 74.[19]

Since *Perry* was decided in 2012, courts have taken different approaches to the question of whether due process concerns apply only to identifications arranged by law enforcement or also to identification procedures initiated by a prosecutor. Discussion has occurred in the context of whether an identification made for the first time in court at trial, based on questions by the prosecutor, is entitled to due process protections. Although that

---

[19] Appellant also cites *Green v. State*, 281 Md. 483, 487, 494 (1977), another case decided before *Perry*. In that case, the victim had been unable to identify Green prior to the trial date. *Id.* at 485. On the day of trial, however, shortly before it began, the victim saw Green in the courthouse and advised the prosecutor that he was able to identify Green as one of the persons who robbed him. *Id.* The Supreme Court of Maryland considered the victim's courthouse observation of Green as an extrajudicial identification, which entitled him to a hearing to determine whether there was any illegality in this circumstance that tainted the in-court identification. *Id.* at 492-94. The court did not address whether such a viewing was impermissibly suggestive. Rather, it merely held that, because Green did not receive a hearing, he was denied due process of law. *Id.* at 494. That case, therefore, is distinguishable from the facts here, where appellant did receive a hearing.

is not the factual scenario here, the discussion of whether due process protections are limited to police-arranged identifications is relevant to this case.

In *Walker v. Commonwealth*, 870 S.E.2d 328, 340 (Va. Ct. App. 2022), *aff'd*, 887 S.E.2d 544 (Va. 2023), *cert. denied*, 144 S.Ct. 827 (2024), Walker argued that the trial court erred in allowing the victim to identify him in court as the perpetrator of a robbery because in-court identifications are inherently suggestive. The Court of Appeals of Virginia noted that an in-court identification was neither the result of "improper police conduct" nor "unnecessary" because it occurred in the ordinary course of a criminal trial. *Id.* at 341. (quoting *Perry*, U.S. at 238-39). The court declined to reach the question of whether the due process analysis regarding identifications initiated by the police applies to identification procedures initiated by prosecutors because, regardless of the answer, improper conduct was required, which did not occur in that case. *Id.* at 341 n. 13.[20]

In *State v. Dickson*, 141 A.3d 810, 827-828 (Conn. 2016), *cert. denied*, 582 U.S. 922 (2017), the court rejected the argument that the due process analysis did not apply to identification procedures arranged by prosecutors. Although acknowledging that the Court in *Perry* discussed the due process analysis in the context of police-arranged

___

[20] In affirming the appellate court, the Supreme Court of Virginia also cited the *Perry* language that the Due Process Clause required preliminary judicial inquiry into the reliability of eyewitness identifications "procured under unnecessarily suggestive circumstances arranged by law enforcement." *Walker v. Commonwealth*, 887 S.E.2d 544, 550 (Va. 2023) (quoting *Perry*, 565 U.S. at 238), *cert. denied*, 144 S.Ct. 827 (2024). The court held that the rules regarding identifications were developed to address conduct outside the courtroom that produced tainted evidence in the courtroom at trial, *id.* at 550, and the Due Process Clause did not require judicial prescreening of identifications made for the first time in the courtroom. *Id.* at 552.

identifications, it stated that the question whether an identification orchestrated by a prosecutor could trigger due process protections was not before the Court in that case, and *Perry* expressly noted that the case law was based on "state action." *Id.* at 828 (quoting *Perry*, 565 U.S. at 721). The Supreme Court of Connecticut stated that the due process rationale for "excluding identifications that are the result of unnecessarily suggestive procedures—deterrence of improper conduct by a state actor—applies equally to prosecutors." *Id.* at 824. It held that "first time in-court identifications, like in-court identifications that are tainted by an unduly suggestive out-of-court identification, implicate due process protections and must be prescreened by the trial court." *Id.* at 825-26. *Compare Garner v. People*, 436 P.3d 1107, 1120 (Colo. 2019), *cert. denied*, 589 U.S. 1033 (2019) ("[W]here an in-court identification is not preceded by an impermissibly suggestive pretrial identification procedure arranged by law enforcement, and where nothing beyond the inherent suggestiveness of the ordinary courtroom setting made the in-court identification itself constitutionally suspect, due process does not require the trial court to assess the identification for reliability.").

We agree that, although due process concerns regarding extrajudicial identifications typically involve police conduct, similar concerns could arise from an unnecessarily suggestive identification procedure arranged by a prosecutor. *See Reyes v. State*, 257 Md. App. 596, 621 (2023) (in conducting the due process analysis, the first step is to "assess whether an impermissibly suggestive procedure, **arranged by a state actor**, procured the identification") (emphasis added). In this case, however, neither the police, the prosecutor,

38

nor any other state actor improperly arranged the viewing at the earlier hearing as an identification procedure. Rather, as indicated, Mr. Rubino appeared in the courtroom for the scheduled trial date, not to see if he could identify appellant.

To the extent that this court proceeding could be considered an identification procedure, and to the extent that appellant was publicly identified as the defendant in court,[21] the viewing could be construed as suggestive. *See Perry*, 565 U.S. at 244 ("[M]ost eyewitness identifications involve some element of suggestion."). Nevertheless, an identification must be *impermissibly* or *unnecessarily* suggestive to require an analysis of reliability before the identification is permitted to go to the jury. *See id.* at 238-39 (due process concerns arise only when there is "an identification procedure that is both suggestive and unnecessary"); *Smiley*, 442 Md. at 180 (the first step in determining admissibility of extrajudicial identification is whether the identification procedure was impermissibly suggestive); *James v. State*, 191 Md. App. 233, 252 (2010) ("Due process principles apply to remedy the unfairness resulting from the admission of evidence that is based on an identification procedure that was 'unnecessarily suggestive' and conducive to misidentification at trial."), *cert. denied*, 415 Md. 338 (2010).

In assessing whether the earlier hearing here was impermissibly suggestive, we find *Baker v. Hocker*, 496 F.2d 615, 616 (9th Cir. 1974) instructive. In that case, a robbery

---

[21] As indicated, the record does not reflect the circumstances regarding appellant's appearance at the hearing, i.e., whether Mr. Rubino could hear the discussion regarding the continuance, which occurred at the bench, or whether it was apparent that appellant appeared at the bench as the defendant.

victim identified two robbers at a line-up, but he could not identify Baker. *Id.* The victim

subsequently identified Baker during a preliminary hearing and at trial. *Id.* Baker argued

that he was denied due process because the preliminary hearing was "so impermissibly

suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

*Id.* at 617 (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).

In concluding that the confrontation did not involve "unnecessary" or

"impermissible" suggestion, the court explained:

> Undoubtedly any in-court identification confrontation, whether at a preliminary hearing or at trial, whether the defendant is tried alone or with others, carries with it the stigma of the inevitable suggestion that the [S]tate thinks the defendant has committed the crime. Perhaps in appellant's case the suggestion was compounded by the presence of the two previously identified men. But more than suggestion is required for a due process violation- the procedure must create 'unnecessary' or 'impermissible' suggestion. As in [*Stovall v. Denno*, 388 U.S. 293 (1967)], the necessity and constitutional propriety of a suggestive confrontation must be judged in light of the [S]tate's interest in the procedure as well as by the danger it poses to a defendant.

\* \* \*

> The risk of a mistaken identification becoming irreparably 'fixed' and not later to be shaken by cross-examination, which condemns suggestive confrontations in the police station, is far less present in the court proceeding because, as here, the identification can be immediately challenged by cross-examination.

*Id. See, e.g., State v. Thomas*, 241 S.E.2d 128, 130-31 (N.C. 1978) ("Viewing of

a defendant at a preliminary hearing by a witness who is offered to testify to the

identification of defendant is not, of itself, such a confrontation as will taint the witness's

in-court identification unless other circumstances are shown which are so unnecessarily suggestive and conducive to irreparable mistaken identification as would deprive the defendant of due process.").[22]

Here, the viewing in the courtroom was not for purposes of an identification, but for trial, which was then continued based on defense counsel's motion. The record reflects that appellant came into the courtroom after defense counsel and the court discussed the continuance motion at the bench. The record does not reflect that appellant was in handcuffs or prison clothes, or even identified to the public as the defendant. Under these circumstances, the State did not engage in any improper conduct in appearing in court with Mr. Rubino on the scheduled trial date, and the circuit court properly found that the identification was not based on an impermissibly suggestive identification procedure. [23]

### III.

### Sufficiency of the Evidence

Appellant contends that the evidence was insufficient to support his "weapon convictions," i.e., his convictions for armed carjacking, armed robbery, first-degree assault,

---

[22] As indicated, this Court in *Coleman v. State*, 8 Md. App. 65, 73 (1969), held that, "[i]n the unusual circumstances" of that case, where the police brought a witness who had been unable to identify Coleman to Coleman's preliminary hearing, and the judge indicated that Coleman was being charged with robbery, the viewing at the preliminary hearing was impermissibly suggestive. As we explain, the facts there were significantly different from those presented here.

[23] We note that, after finding that the viewing at the continuance hearing was not unnecessarily suggestive, the court was not required to assess the reliability of the identification. Nevertheless, as indicated, the court subsequently did find that Mr. Rubino's in-court identification was reliable.

and use of a firearm in the commission of a crime of violence. He asserts that "[p]roof of the use of a 'dangerous weapon' or a 'firearm' was required to sustain a conviction on each of these offenses," but the State introduced only "meager evidence on the weapon element," which was insufficient to generate a rational inference that there was a dangerous weapon or a firearm.

The State contends that, to the extent this issue is preserved, there was sufficient evidence to support appellant's weapons convictions. In support, it notes "the repeated testimony of both victims that the carjacker used a gun."

## A.

### Preservation

We address the State's preservation argument first. The State contends that appellant's motion for judgment of acquittal focused solely on "whether there was sufficient evidence that [appellant] used a 'gun' or 'handgun' or 'firearm,'" and he did not argue that there was insufficient evidence that "a 'dangerous weapon' was used . . . even if it was not actually a firearm." It cites no caselaw in support of its argument that this deficiency rendered the claim unpreserved for review.

Appellant contends that the issue is preserved for review. He argues that a motion for judgment of acquittal need only "generally include the issue raised on appeal" to meet the preservation requirement.

"Pursuant to Maryland Rule 4-324(a), a criminal defendant who moves for judgment of acquittal must 'state with particularity all reasons why the motion should be

42

granted[,]' and 'is not entitled to appellate review of reasons stated for the first time on appeal.'" *Redkovsky v. State*, 240 Md. App. 252, 261 (2019) (quoting *Starr v. State*, 405 Md. 293, 302 (2008)). A motion for judgment of acquittal, however, "may be sufficient to preserve an issue where the acquittal argument generally includes the issue raised on appeal." *Id.* at 261-62.

Here, appellant argued for a motion for judgment of acquittal on the firearm counts, stating that the evidence was "pretty weak on describing any gun with any specificity." We agree with the State that appellant preserved only the argument that there was insufficient evidence of a firearm and confine our analysis to that claim.[24] We turn to the merits of that argument.

**B.**

**Standard of Review**

The standard of review for a sufficiency challenge is whether, viewing the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Brown v. State*, 252 Md. App. 197, 208 (2021) (quoting *Scriber v. State*, 236 Md. App. 332, 344 (2018)). "'The jury as fact-finder possesses the ability to choose among differing inferences that might possibly

---

[24] We note, however, that if there was sufficient evidence that a gun was used, there was sufficient evidence of a dangerous and deadly weapon. *See Brooks v. State*, 314 Md. 585, 590 (1989) (A pistol, even when unloaded, is a dangerous weapon because an "unloaded pistol . . . could be used as a bludgeon and could be loaded, 'under some circumstances within a matter of seconds,' thus making it objectively dangerous and deadly.")

be made from a factual situation' and the appellate court 'must give deference to all reasonable inferences [that] the fact finder draws, regardless of whether [the appellate court] would have chosen a different reasonable inference.'" *Id.* (alterations in original) (quoting *Bible v. State*, 411 Md. 138, 156 (2009)).

## C.

### Analysis

Two offenses that were the subject of a motion for judgment of acquittal, armed carjacking and armed robbery, require evidence of a dangerous weapon. *See* Md. Code Ann., Crim. Law ("CR") § 3-405(c)(1)-(2) (2021 Repl. Vol.) (a person commits armed carjacking where they "employ or display a dangerous weapon during the commission of a carjacking"); CR § 3-403(a)(1) ("A person may not commit or attempt to commit robbery . . . with a dangerous weapon."). "Neither offense requires the use of a 'handgun,'" although the "[u]se of a handgun that meets the statutory criteria is a sufficient, but not necessary predicate for a conviction of either armed carjacking or armed robbery." *Teixeira v. State*, 213 Md. App. 664, 681-82 (2013). As indicated, appellant failed to preserve an argument that the gun described by the witnesses was insufficient to prove the use of a deadly or dangerous weapon.

The two other offenses that were subject to a motion for judgment of acquittal, assault in the first degree and use of a firearm in the commission of a crime of violence, require evidence of a firearm. *See* CR § 3-202(b); CR § 4-204(b). Both statutes define "firearm" as including a "handgun." *Id.* A handgun is defined as "a pistol, revolver, or other

44

firearm capable of being concealed on the person"; it includes "a short-barreled shotgun and a short-barreled rifle" but does not include "a shotgun, rifle, or antique firearm." CR § 4-201(c).

This Court has held that evidence is "sufficient to conclude that a weapon was a handgun based on eyewitness testimony stating that a handgun was used." *Brown v. State*, 182 Md. App. 138, 168 (2008). Here, both witnesses testified that appellant possessed a gun during the incident, and one of those witnesses characterized the weapon as a handgun. Ms. Slusher testified that she saw "a gun in the door" of her car, pointing at her. She stated that, although she was "not totally familiar with guns," she knew that what the assailant had "was a small gun, black in color, and it was . . . some type of handgun." Mr. Rubino testified that appellant pointed a gun at him and told him to put all his belongings in the front seat of Ms. Slusher's vehicle. When asked if it was possible there was "something black in [appellant's] hand perhaps that you thought" was a gun, Mr. Rubino responded: "No. He had a gun." This evidence was sufficient for a rational trier of fact to determine that the gun was a handgun.

**JUDGMENTS OF THE CIRCUIT COURT FOR WASHINGTON COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**